# In the United States Court of Federal Claims

**No. 18-998C**
**Filed: May 22, 2019**
**Reissued: June 11, 2019[1]**

\* \* \* \* \* \* \* \* \* \* \* \* \*     \*

**MLS-MULTINATIONAL LOGISTIC**  \*
**SERVICES, LTD,**  \*
\*   **Pre-Award Bid Protest; Motion to**
**Protestor,**  \*   **Dismiss; Lack of Subject Matter**
\*   **Jurisdiction; Standing; Wavier;**
**v.**  \*   **Contract Disputes Act.**
\*
**UNITED STATES,**  \*
\*
**Defendant,**  \*
\*
**v.**  \*
\*
**GLOBAL DEFENSE LOGISTICS,**  \*
**SRL,**  \*
\*
**Defendant-Intervenor.**  \*
\*

\* \* \* \* \* \* \* \* \* \* \* \* \*

    **Walter A.I. Wilson**, Polsinelli, PC, Washington, D.C., for protestor.  Of counsel were **Daniel J. Donohue, Claude P. Goddard, Jr.** and **Abbi M. Jankowski**, Polsinelli, PC, Washington, D.C.

    **Michael D. Snyder**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  With him were **Amelia Lister-Sobotkin**, Trial Attorney, **Franklin E. White, Jr.**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, and **Joseph H. Hunt**, Assistant Attorney General, Civil Division, Department of Justice. Of counsel were **Andre Ahuna, Sandra Cain,** and **Scott E. Miller**, United States Navy.

---

[1] This Opinion was issued under seal on May 22, 2019. The parties were given the opportunity to propose possible redactions, but no redactions were proposed. The original opinion is hereby unsealed and reissued without redaction.

**Robert K. Tompkins**, Holland & Knight LLP, Washington, D.C., for defendant-intervenor. Of counsel were **Leila George-Wheeler** and **Rodney M. Perry**, Holland & Knight LLP, Washington, D.C.

# O P I N I O N

**HORN, J.**

Protestor, MLS-Multinational Logistics Services Ltd (MLS), filed the above captioned protest to challenge the terms of Solicitation No. N68171-17-R-0004 (the Solicitation), for maritime husbanding support services for the United States Navy as "contrary to applicable law and impossible to perform, prejudicing MLS by preventing MLS from offering its best terms in a proposal under the solicitation and from having a fair opportunity to compete for the contract and task orders under it."

## FINDINGS OF FACT

As the protestor and defendant have jointly stipulated:

On September 14, 2017, the Navy, through its Naval Supply Systems Command Fleet Logistics Command (NAVSUP FLC), Sigonella, Detachment Naples, issued Solicitation No. N68171-17-R-0004 (the Solicitation), seeking proposals for firm fixed price, multiple-award indefinite delivery/indefinite quantity (IDIQ) contracts to provide maritime husbanding support services to Navy and United States Coast Guard vessels visiting foreign ports in the Middle East within the United States Central Command (CENTCOM), Fifth Fleet area of responsibility.

The Solicitation indicated that that multiple awards would be made based upon a lowest price technically acceptable source selection decision. The Solicitation provided that "[o]fferors shall propose firm-fixed unit prices for the basic contract and those prices shall be used for evaluation for award of the basic contracts, and serve as maximum prices."

The Solicitation sought awardees to provide husbanding services, which the joint stipulations state, "can include a wide range of items such as arranging for berthing locations, supplying pilots, tug boats, and water taxis, removing trash and sewage, and providing fuel and utilities, among other things." The joint stipulations provide that husbanding service providers are involved in organizing a "ship's visit from the pre-arrival arrangements to the ship's departure and after the ship's departure." The joint stipulations also provide that "[h]usbanding support services are services provided to a ship when it is in port, including so-called 'Port Tariff' items. The solicitation states: 'Port Tariff items and Port Dues are services rendered by a Port Authority's concessionaire.'"

The Navy's policy is to procure husbanding services through contracts with husbanding service providers covering specific geographic regions, and the Solicitation at issue was to cover husbanding support services in all ports in Bahrain, Jordan,

Pakistan, United Arab Emirates, Egypt, Kuwait, Qatar, Yemen, Iraq, Oman, and Saudi Arabia, or as indicated in the Solicitation, the Fifth Fleet area of responsibility.

The Solicitation contemplated making multiple contract awards and for contract awardees to "compete at the task order level for task orders to provide husbanding services for particular port visits." The joint stipulated facts indicate "[t]he Solicitation requires that, for task order proposals, offerors are to propose fixed prices that include all costs of providing the required husbanding services, including, as relevant here, port tariff services." The joint stipulations further state:

> The Solicitation provides that one or more task orders may be issued during performance of the contract. Pursuant to the terms of the Solicitation, requests for task order proposals (RTOP) for specific port visits are issued and contractors have the opportunity to submit offers. A selection would then be made, in most cases, based upon a lowest price technically acceptable basis.

(capitalization in original). The Solicitation indicated that for the requests for task order proposals, "all proposed prices at the task order level" "shall not exceed the maximum prices indicated in the basic contract." In addition, offerors were to propose fixed prices that include all costs of providing the required husbanding services, including port tariff services in the task order proposals.

The Solicitation stated that husbanding service providers "shall not be reimbursed, paid, or otherwise compensated for any port use charges, fees, dues or similar costs at ports at which existing host country agreements exempt vessels of the United States from such charges, fees, or dues." The Solicitation's Performance Work Statement, in a "description of contractual scope," further specified:

> The services to be provided through performance consist of maritime husbanding support. The holder of this contract is a U.S. Navy contractor, a husbanding service provider (HSP), and is NOT an agent of the U.S. Navy and does not have the authority to bind the U.S. Navy. Maritime husbanding support is provided by a HSP from a standard list of supplies/services at a contract fixed price. The HSP shall ensure that ordered supplies and services conform to the general requirements of the contract pursuant to this PWS [Performance Work Statement]. The geographic scope and region covered by this contract includes **ALL** commercial and military ports located in the United States Central Command (CENTCOM) area of responsibility (AOR).

(capitalization and emphasis in original). The Solicitation, at Schedule Note 3, also provided that:

> Port Tariff items and Port Dues are services rendered by a Port Authority's concessionaire. These are considered as "Reserved Items" and

are grayed out in the ELIN spreadsheets (Exhibit A, B, and C) and a firm-fixed-price (FFP) will be proposed by the HSP at the Request for Task Order Proposal (RTOP) level. The Government expects HSPs to be the prime contractors for services rendered in a port. If contractors encounter an issue regarding Port Tariffs and/or Port Dues at the Task Order level, they shall immediately notify the Contracting Officer. In cases where prices are regulated by governments, such as certain Port Tariffs, they will be identified at the RTOP level. Port Tariff documentation may be required to accompany invoices upon completion of individual task orders during performance of the contract. If this is contrary to local laws or regulations, HSPs shall immediately notify the Contracting Officer.

(capitalization in original).

Regarding the evaluation of the offerors' proposals, the Solicitation provided that "[t]his is a multiple award, lowest price technically acceptable (LPTA) source selection. The Government intends to award on initial offers but reserves the right to conduct discussions," and "[t]he Government has complete discretion to determine the number of awards for each region with evaluated price being the deciding factor when comparing technically acceptable offerors in a particular region." The Solicitation indicated that:

The following factors will be used to evaluate proposals: Technical Acceptability and Price.

Technical Acceptability will be evaluated on an Acceptable/Unacceptable basis and will consist of evaluation of two sub-factors: 1) The proposal does not take exception to any term of the Solicitation, and, 2) the proposal provides a price for all ELINs [Exhibit Line Item Numbers] not grayed out in the Exhibit A, B, and C Pricing Schedules. Proposals must receive an "Acceptable" evaluation in each of the two Technical Acceptability subfactors in order to receive an overall rating of Technically Acceptable. Only those proposals that receive an overall rating of Technically Acceptable can be eligible for award.

Price: The Government will only make award to responsible offerors with the lowest price proposal whose non-price factors are evaluated Technically Acceptable.

. . .

After rating offerors for Technical Acceptability and completing the price analysis, the contracting officer will determine whether the low price, technically acceptable offerors are responsible. Awards will only be made

to those among the lowest priced Technically Acceptable offers that satisfy the general responsibility standards of FAR 9.104-1.[2]

The Solicitation made clear that "[a]ny exception taken to line item descriptions or units of issue shall be submitted in writing to the Contracting Officer prior to the date of solicitation closing," and indicated that "[p]roposals that take exception to any term of the solicitation will not be considered for award; therefore, any exception to the Government's terms must be resolved prior to the solicitation closing date."

The Navy had previously issued solicitations and awarded contracts to various contractors to provide maritime husbanding support services to Navy and United States Coast Guard vessels visiting foreign ports in the Middle East. The joint stipulations state that "MLS is a long-time Husbanding Service Provider (HSP) contractor to the United States Department of the Navy (Navy)." MLS' previous contract for husbanding services provided:

> The services to be provided through performance consist of maritime husbanding support. The holder of this contract is a U.S. Navy contractor, a husbanding service provider (HSP), and is NOT an agent of the U.S. Navy and does not have the authority to bind the U.S. Navy. Maritime husbanding support is provided by a HSP from a standard list of supplies/services at a contract fixed price or at a port tariff (PT) established by a Port Authority. Any other service/supply ordered by the ship, but not priced under this contract, will be procured by the Supply Officer of the ship using his/her own contracting authority, or by NAVSUP FLCSI, Detachment Naples, contracting officers using an alternative contracting approach i.e [sic] via modification to the contract under the authority of FAR clause 52.243-1 "Changes- Fixed Price, Alternate II" or via a separate contract. The geographic scope and region covered by this contract includes ALL commercial and military ports located in the U.S. Central Command (CENTCOM) Fifth Fleet Area of Responsibility (AOR). . . .

(capitalization in original). Although the above quoted portion of MLS' previous contract was similar to the language in the Solicitation currently at issue, MLS' previous contract language regarding port tariffs was different. MLS' previous contract provided:

> Port Tariff items are services rendered by a Port Authority's concessionaire at rates established and controlled by Port Authorities and published in a public list. The abbreviation "PT" in the pricing schedule identifies the port tariff items that the HSP is not required to price. When the HSP obtains a supply or service from a port or local government-type organization and the

---

2 As discussed below, MLS received a contract award from the Navy, so the court does not focus on the ratings that MLS received, or any other potential offeror's ratings, in this Opinion. Moreover, in filing the above captioned protest as a pre-award protest, MLS is challenging the terms of the Solicitation, and not the evaluations undertaken by the Navy.

price of that item is set by a published price list then the HSP shall charge the published price of the item. The HSP shall not be paid an amount in excess of the published price of the item. English translated copies of the published price list and documentation from the port authority establishing the provider as a mandatory source shall be provided with the estimate to the Supply Officer (SUPPO) or Naval Supply System Command (NAVSUP) Fleet Logistic Center Sigonella (FLCSI) contracting officer. If Port Tariffs apply in a port the HSP will provide fixed price items to support the port provided service. As an example, water or trash is port provided but the ship anchors out and the HSP requires a barge to get the service to the ship. The HSP must have a firm fixed price for the required barge in their pricing schedule to include any mobilization and demobilization costs. The Government has provided quantity estimates for PT items based on historical experience to facilitate offerors' development of fixed prices for associated items.

(capitalization in original).

As indicated in its complaint, early in the procurement process, MLS was troubled by the Port Tariff provisions in the Solicitation. MLS raised its concerns regarding the Solicitation's different Port Tariff provisions with the Navy during the pre-proposal questions and answers portion of the Solicitation process. In Question 2, MLS asked the Navy: "Host nation regulations stipulate that all ships berthed in ports of CENTCOM should have a licensed agent. How will the contractor meet the requirement of declaration as agent to the port if the contract does not permit it?" (capitalization in original).[3] The Navy responded:

The solicitation does not prohibit, nor does it limit, the ability of any contractor from entering into any legal arrangement with subcontractors or port authorities that they determine necessary in order to fulfill their contracted and legally binding obligations under the U.S. government

---

[3] As discussed below, MLS raised the issue of the Port Tariff provisions during the questions and answers portion of the Solicitation, as well as during its agency level protest.  Moreover, MLS' attorney of record, at oral argument represented that, once performing as a contractor,

we followed the requirements of the contract and notified the Navy of that [the issue of the port regulations not allowing MLS to work in the port unless they were an agent of the Navy], and the Navy went out and got another contractor who was willing to say they were an agent of the Navy to perform the service, and we were – notified [by] the Navy of that fact. They threatened to terminate us unless we'd stop saying that.

Intervenor Global Defense Logistics, SRL (Global Defense Logistics) subsequently received the task order awards that MLS was unwilling or unable to perform.

contract. How a contractor who is awarded a U.S. government contract under this solicitation meets its contractual obligations with their own subcontractors or with port authorities is entirely within the discretion of the respective contractor.

In Question 7, MLS asked the Navy:

Has the Navy conducted verifications ahead of the solicitation with local port authorities in the AOR [Area of Responsibility] to determine whether or not they will accept an HSP as the Navy's prime contractor and contemporaneously not being its agent?" This schedule note makes absolutely no sense since no port authority in the world would ever subjugate themselves to a US Navy Husbanding contractor based in any jurisdiction of the world, port agent or any other vessel owner - even the US Navy. This is the case especially with respect to Military ports that are completely under the control of the host government. This solicitation attempts to render the HSP the prime contractor for the Navy and contemporaneously declaring that it is not the Navy's agent. The port authorities in the AOR take a directly opposite view and hold the HSP responsible as though he is the Navy's agent. This is the legal position and the solicitation is completely undermining it and underestimating the serious legal consequences which will flow from such legal chaos. There is a legal void here between the Navy's position and the port authorities' position which cannot be reconciled. Since the reality is that port authorities will not agree to this subjugation, the entire schedule note #3[4] should be removed from the solicitation/contract as it is illegal and unenforceable.

---

[4] As quoted above, Schedule Note 3 of the Solicitation provides:

Port Tariff items and Port Dues are services rendered by a Port Authority's concessionaire. These services are considered as "Reserved Items" and are grayed out in the ELIN spreadsheets (Exhibit A, B, and C) and a firm-fixed-price (FFP) will be proposed by the HSP at the Request for Task Order Proposal (RTOP) level. The Government expects HSPs to be the prime contractors for services rendered in a port. If contractors encounter an issue regarding Port Tariffs and/or Port Dues at the Task Order level, they shall immediately notify the Contracting Officer. In cases where prices are regulated by governments, such as certain Port Tariffs, they will be identified at the RTOP level. Port Tariff documentation may be required to accompany invoices upon completion of individual task orders during performance of the contract. If this is contrary to local laws or regulations, HSPs shall immediately notify the Contracting Officer.

(capitalization in original).

(capitalization in original). The Navy responded: "The Navy has not conducted such verifications and does not expect to do so. Any such verification with port authorities is the responsibility of the contractor intending to propose under the solicitation. See also, response to question 2, above."

The joint stipulations indicate that "MLS timely submitted a proposal in response to the Solicitation on December 6, 2017. MLS acknowledged all amendments and submitted required information and pricing in accordance with the Solicitation." The joint stipulations also indicate that "[n]one of the revisions to the Solicitation requested by MLS in its second agency level protest were made by the Navy, and that the Solicitation closed on December 13, 2017."[5]

Prior to the proposal due date, on November 25, 2017, MLS had filed an agency level protest regarding the Port Tariff provisions in the Solicitation and had requested that the Navy revise the Solicitation to resolve the conflict between the Solicitation's Port Tariff provisions and local port regulations and to allow offerors to submit proposals in response to the revised requirements. The three issues raised in the agency level protest were:

1. The Solicitation's provisions concerning Port Tariff items are contrary to the regulations of the Ports. Port regulations require that Port Tariff items be obtained by the owner of the vessel or an authorized agent of the owner. The Solicitation expressly states that the HSP contractor is NOT the agent of the Navy. It is therefore impossible for the HSP contractor to perform according to the terms of the Solicitation. Thus, the Solicitation does not state the Navy's actual requirements for Port Tariff items. The Solicitation must be revised so that either a.) the Navy deals directly with the Port for Port Tariff items, as historically has been the Navy's practice, or b.) to make the HSP contractor the agent of the Navy for purposes of obtaining Port Tariff items on behalf of the Navy.

2. The Solicitation also requires the HSP contractor to agree to terms and conditions beyond those covered by a Port tariff, but that the Navy will only pay the HSP the Port Tariff amount. The Solicitation must be revised to allow the HSP to price these additional terms and conditions.

3. Some of the Navy's terms and conditions in the Solicitation are contrary to the Ports' regulations in other respects. For example, Ports' regulations provide that the vessel owner is liable for damage done by the vessel and fines imposed on the vessel. But this Solicitation provides that the HSP, not the Navy, is liable for such things. Although this Solicitation treats a Port as

---

[5] As referenced in the joint stipulations, MLS had previously filed an agency level protest on September 20, 2017, challenging the 7 day limit for submitting questions. On September 22, 2017 the Navy issued Amendment 0001 to the Solicitation, which extended the period for questions from 7 days to 21 days from the date the Solicitation was issued, rendering MLS' first agency level protest moot.

the subcontractor of the HSP, the Ports have refused to comply with requirements this Solicitation imposes on subcontractors. The Solicitation must be revised to eliminate the terms and conditions that are contrary to the Ports' regulations.

(capitalization in original). After raising these issues in the agency level protest, MLS requested "that the Navy revise this Solicitation to make it consistent with Port regulations to make it possible for the HSP to perform and so that the Solicitation accurately states the Navy's actual requirements for obtaining Port Tariff items. We also ask the Navy to extend the time for submission of proposals so that MLS and other offerors have an opportunity to submit proposals based on the Navy's actual requirements for Port Tariff items." (capitalization in original). The Navy did not respond to MLS' second agency level protest before proposals were due. MLS, without the benefit of the Navy's decision, decided to submit a proposal anyway.

After MLS submitted its proposal, but before contract awards were made, on January 19, 2018, the Navy denied MLS' agency level protest. The Navy's denial stated, in part:

> Contrary to the protest, at the ports covered by this solicitation the Navy has not historically followed the practice of dealing directly with the port for port tariff items. Rather, supplies and services covered by a port tariff have almost universally been acquired under the applicable husbanding contract. The Government reiterates its position that the solicitation does not authorize the HSP to agree with a port that it has agency authority to bind a Navy ship covered by an order to be issued under the contract. The Government intends to contract with the HSP for supplies and services and depends on the HSP to, in turn, ensure that those supplies and services are provided. That may require, at times, that the HSP contract with a port authority or its designated provider to supply the required supplies and services to the Navy ship.

> The Government recognizes that different ports may have different rules and regulations and that those rules and regulations may change from time to time. When an HSP looks at the solicitation and the ports covered by the solicitation, the Government reasonably expects it will consider the applicable local rules and regulations, the manner in which the rules and regulations have been applied and enforced, and alternatives that may exist (or can be suggested) to allow port visits to proceed in accordance with the model set out in the solicitation. The solicitation covers a number of named ports as well as all other ports in each of the countries included in the solicitation. The Government depends on the HSP to know those terms and conditions and to apply approaches that will allow the Government/HSP contract/supplier model in the solicitation to be applied. In some ports that may just require that the HSP explain the Navy's contractual relationship with the HSP, while at other ports more innovative solutions may be needed

such as the HSP providing the port or the port designated provider some type of a bond.  If these alternative approaches result in added cost to the HSP, the HSP may wish to consider including allowance for such costs when determining its fixed prices for supplies and services at the port.

Regardless of what approach may be necessary, the Navy does not authorize the HSP to agree that the HSP has agency authority to contractually bind the Navy or its ships.  In limited instances, it may be that one HSP is able to come to agreement with a port for a supply or services in a way that does not purport to bind the Navy while another HSP is unable to reach an agreement. If such a case should happen, then it may result in a situation in which one HSP but not another is able to submit an offer for a specific port or port visit. Such a situation would not be unlike other situations in which one HSP is able to identify and arrange for services in support of a port visit but another HSP is unable to do so and, thus, is unable to submit a complete offer or RTOP response. The protest included several examples of port tariff regulations. However, only one, the Bahrain Ports Tariff Terms and Definitions, is for services at ports covered by the solicitation.  Husbanding services in Bahrain have historically been acquired through the HSP rather than directly from the port or the port directed service provider.  Based on this rationale, the protest request is denied.

(capitalization in original).

After the Navy denied MLS' agency level protest, on January 29, 2018, MLS filed a protest at the United States Government Accountability Office (GAO). On March 15, 2018, the GAO issued a decision and determined that MLS' GAO protest was untimely, indicating that:

With respect to the arguments raised in their agency-level protest, they are untimely because those arguments were raised with our Office more than 10 days after the protester had actual or constructive knowledge of adverse agency action, that is, when the Navy proceeded with the receipt of proposals without amending the RFPs and extending their deadline for proposals as requested by MLS.

MLS-Multinational Logistic Servs., Ltd., B-415971 (Comp. Gen. Mar. 15, 2018) (citing 4 C.F.R. § 21.2(a)(3)).[6] At the GAO the Navy argued that MLS was not an interested party,

---

[6] The court notes that in addition to the March 15, 2018 GAO decision in MLS-Multinational Logistic Services, Ltd., B-415971, on March 7, 2018, the GAO issued a separate decision in which MLS was protesting a different solicitation at the GAO for husbanding services at various ports throughout Southeast Asia and the Western Pacific region. See generally MLS-Multinational Logistic Servs., Ltd., B-415782, 2018 WL 1292614 (Comp. Gen. Mar. 7, 2018). Similar to the GAO protest for the Solicitation at issue in this protest, the GAO decision for the husbanding services at various ports

however, the GAO concluded that "MLS is an interested party for the purposes of these procurements, because the protester's argument is that the solicitations must be amended in a way that reasonably could materially affect the resulting competitions, both at the contract and task order levels." Id.

After the March 15, 2018 decision by the GAO, on April 30, 2018, the Navy awarded contract number N6817118D0003 to MLS.  MLS was one of nine contractors to receive a contract award.[7] According to the joint stipulations, subsequently "MLS has received multiple task orders to provide husbanding services under the Contract." On July 11, 2018, and after the contracts were awarded under the Solicitation, MLS filed the above captioned protest in the United States Court of Federal Claims. MLS indicated that it was protesting

> the terms of a solicitation as contrary to applicable law and impossible to perform, prejudicing MLS by preventing MLS from offering its best terms in a proposal under the solicitation and from having a fair opportunity to compete for the contract and task orders under it. MLS seeks declaratory and injunctive relief to the effect that the solicitation must be revised to be consistent with applicable law and so that MLS will have a fair opportunity to compete for award of a contract and task orders under it.

MLS seeks:

> A declaratory judgment that the Solicitation's Port Tariff provisions are in violation of applicable law and regulations, and must be revised so that its Port Tariff provisions are consistent with applicable laws and regulations, and to allow MLS and other offerors to compete on a fair and equal basis for award of a contract under the Solicitation and for task orders thereunder. The Solicitation's Port Tariff provisions must be revised so that they either: 1) provide for the Navy to contract directly with the Port for Port Tariff items, as the Navy has done in the past; or 2) make the HSP the Navy's agent authorized to contract with the Port on behalf of the Navy and to bind the Navy.

After the bid protest complaint was filed in the United States Court of Federal Claims, this court held an initial hearing[8] and the parties agreed to a schedule to brief the

---

throughout Southeast Asia and the Western Pacific region also addressed the Port Tariff provisions and the GAO similarly dismissed that protest as untimely under the GAO's ten day rule. See id.

[7] Intervenor Global Defense Logistics also received a contract award.

[8] In addition to declaratory relief, MLS also sought preliminary injunctive relief, but at the initial hearing the protestor indicated it was not pursuing preliminary injunctive relief and was ready to brief all issues on the merits.

parties' cross-motions for judgment on the Administrative Record, as well as defendant's and intervenor's motions to dismiss MLS' complaint for lack of subject matter jurisdiction. After briefing was completed, the court held oral argument in the above captioned protest.[9]

## DISCUSSION

As a threshold matter, the court addresses defendant's and intervenor's motion to dismiss pursuant to Rule 12(b)(1) (2018) of the Rules of the United States Court of Federal Claims. Defendant argues that the court should dismiss protestor's complaint "for lack of subject matter jurisdiction because MLS's bid protest action is untimely, MLS lacks standing, MLS's claims raise contract administration issues that do not fall within this Court's bid protest jurisdiction. . . ." Defendant specifically questions

> [w]hether MLS can protest the terms of a solicitation where it failed to diligently pursue its claims and did not initiate this bid protest until nearly four months after its protest before the United States Government Accountability Office (GAO) was dismissed, and approximately two and a half months after it was awarded contract number N68171-18-D-0003 (the Contract) under solicitation number N68171-17-R-0004 (the Solicitation).

Defendant also questions "[w]hether MLS has standing to maintain its bid protest where it is an awardee of a contract under the Solicitation, has been awarded more than 20 task orders under the Contract, valued at more than $1.2 million, and was not prejudiced by the terms of the Solicitation."

Intervenor similarly argues that "MLS slept on its rights for approximately half a year and failed to present its protest in a timely way. After losing an agency-level protest and then filing an untimely protest with the Government Accountability Office (GAO), MLS waited many months to bring its protest at this Court." Intervenor also asserts that because the Navy choose MLS as an awardee under Solicitation, "at best MLS' complaints can be no more than matters of contract administration subject to the requirements, jurisdictional and otherwise, of the Contracts [sic] Disputes Act (CDA). Such contractor claims cannot be heard under this Court's bid protest jurisdiction pursuant to 28 U.S.C. [§] 1491(b)." Intervenor further argues, "[n]ow that it has become an awardee, MLS cannot establish that it is an actual or prospective bidder as required to establish standing," and, therefore, MLS "cannot establish sufficient prejudice to demonstrate that it is an interested party." MLS responds that "MLS properly and timely asserted its protest rights in an agency-level protest and thereafter diligently pursued them," and also argues that "MLS has standing as an actual offeror challenging the terms of the Solicitation."

---

[9] The court notes that oral argument was delayed significantly at the parties' request, in part because of the parties' unavailability, and then delayed again for 35 days by the government shutdown. Oral argument finally was able to be scheduled in March 2019.

Defendant also argues that "[t]he doctrine of waiver compels dismissal of MLS's protest," citing to Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007). In contrast, protestor argues that MLS "indisputably met the Blue & Gold Fleet standard." In Blue & Gold, the United States Court of Appeals for the Federal Circuit addressed whether if an offeror had the opportunity to object to a patent error in the terms of a solicitation, but failed to do so, did the offeror waive the right to challenge that same error in a subsequent bid protest. See id. at 1313. In Blue & Gold, the protestor challenged the National Park Service's award of a contract to Hornblower Yachts, Inc. (Hornblower) for ferry services to Alcatraz Island. See id. at 1310-11. The protestor argued that Hornblower's proposal did not include employee wage and benefits information required by the Service Contract Act, thus, making the Park Service mistakenly evaluate the cost of Hornblower's proposal. See id. at 1312. The Federal Circuit acknowledged that "[b]y statute, the Park Service must 'evaluate . . . proposals and make an award based solely on the factors specified in the solicitation.'" Id. at 1313 (quoting 10 U.S.C. § 2305(b)(1)). Moreover, in Blue & Gold, the Federal Circuit acknowledged that "[i]n this case, it is true that the decision not to apply the Service Contract Act to the contract may have influenced the evaluation of the proposals; however, the Park Service made this decision during the solicitation, not evaluation, phase of the bidding process." Id. The Federal Circuit in Blue & Gold noted that the solicitation "did not include any requirement that the bidders consider the Service Contract Act," id., and that the protestor had not raised any objection to the exclusion of the Service Contract Act requirements prior to the submission of proposals. Therefore, the Federal Circuit found that the protestor was challenging the terms of the solicitation, not the agency's evaluation of Hornblower's proposal. See id.

The Federal Circuit also noted that the protestor in Blue & Gold had failed to challenge the terms of the solicitation until after the Park Service had selected Hornblower for contract award. See id. at 1311. In considering if the protestor had waited too long to challenge the solicitation, the Federal Circuit noted that decisions of the Court of Federal Claims had concluded "that where there is a 'deficiency or problem in a solicitation . . . the proper procedure for the offeror to follow is not to wait to see if it is the successful offeror before deciding whether to challenge the procurement, but rather to raise the objection in a timely fashion.'" Id. at 1314 (quoting N.C. Div. of Servs. for the Blind v. United States, 53 Fed. Cl. 147, 165 (2002), aff'd, 60 F. App'x 826 (Fed. Cir. 2003)) (omission in original); see also Draken Int'l, Inc. v. United States, 120 Fed. Cl. 383, 393 (2015). In Blue & Gold, the Federal Circuit held:

> [A] party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313; see also Per Aarsleff A/S v. United States, 829 F.3d 1303, 1312 (Fed. Cir. 2016); Land Shark Shredding, LLC v. United States, 142 Fed. Cl. 301, 311 (2019); MSC Indus. Direct Co. v. United States, 140 Fed. Cl. 632, 641 (2018); Phoenix Mgmt., Inc. v. United States, 125 Fed. Cl. 170, 181 (2016); Universal Marine Co., K.S.C. v. United States, 120 Fed. Cl. 240, 248-49 (2015);

Northeast Constr., Inc. v. United States, 119 Fed. Cl. 596, 609 (2015); Innovative Mgmt. Concepts, Inc. v. United States, 119 Fed. Cl. 240, 245 (2014); CliniComp Int'l, Inc. v. United States, 117 Fed. Cl. 722, 737–38 (2014)) ("The rule in *Blue and Gold Fleet* thus bars a protester from raising objections to patent errors or ambiguities in the terms of a solicitation after the closing of bidding if such errors or ambiguities were apparent on the face of the solicitation," and "[w]hen a solicitation contains a patent ambiguity, the offeror has '"a duty to seek clarification from the government, and its failure to do so precludes acceptance of its interpretation"' in a subsequent court action." (quoting Blue & Gold Fleet L.P. v. United States, 492 F.3d at 1313 (quoting Stratos Mobile Networks USA, LLC v. United States, 213 F.3d 1375, 1381 (Fed. Cir. 2000)))). The Federal Circuit in Blue & Gold reasoned that such a waiver rule, "requir[ing] that a party object to solicitation terms during the bidding process," furthered the mandate in 28 U.S.C. § 1491(b) that, "'the courts shall give due regard to the interests of national defense and national security and *the need for expeditious resolution of the action*.'" Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (quoting 28 U.S.C. § 1491(b)(3)) (emphasis in original).

The Federal Circuit also explained in Blue & Gold:

"It would be inefficient and costly to authorize this remedy after offerors and the agency had expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation. Vendors cannot sit on their rights to challenge what they believe is an unfair solicitation, roll the dice and see if they receive award [sic] and then, if unsuccessful, claim the solicitation was infirm."

Id. at 1314 (alteration in original) (quoting Argencord Mach. & Equip., Inc. v. United States, 68 Fed. Cl. 167, 175 n.14 (2005); see also Bannum, Inc. v. United States, 115 Fed. Cl. 257, 274 (2014).

Additionally, the Federal Circuit has repeatedly determined that waiver can apply to pre-award protests as well as to post-award protests. The Federal Circuit in COMINT Systems Corp. v. United States, 700 F.3d 1377 (Fed. Cir. 2012), extended the logic of Blue & Gold to all pre-award situations, as follows:

In *Blue & Gold Fleet, L.P. v. United States*, this court held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims." [*Blue & Gold Fleet, L.P. v. United States*,] 492 F.3d 1308, 1315 (Fed. Cir. 2007). Comint points out that *Blue & Gold's* holding does not explicitly apply to this case since Comint had no opportunity to challenge the solicitation before "the close of the bidding process," Amendment 5 having been adopted after the bidding process closed. Amendment 5 was, however, adopted before the award, and we think the reasoning of *Blue & Gold* applies to all situations in which the protesting party had the opportunity to challenge a solicitation before

the award and failed to do so.

There is no question that Comint could have challenged the solicitation before the award. The Federal Acquisition Regulations require that agency contracting officers "consider all protests . . . *whether protests are submitted before or after award.*" 48 C.F.R. § 33.102(a) (emphasis added). If efforts to obtain relief from the contracting officer fail, the Tucker Act specifically authorizes pre-award challenges. The statute gives the Claims Court "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency," and further provides that the Claims Court has jurisdiction "without regard to whether suit is instituted before or after the contract is awarded." 28 U.S.C. § 1491(b)(1).

The same policy underlying *Blue & Gold* supports its extension to all pre-award situations. In *Blue & Gold*, we explained:

> In the absence of a waiver rule, a contractor with knowledge of a solicitation defect could choose to stay silent. . . . If its [ ] proposal loses to another bidder, the contractor could then come forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors. A waiver rule thus prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation.

[*Blue & Gold Fleet, L.P. v. United States,*] 492 F.3d at 1314.

To be sure, where bringing the challenge prior to the award is not practicable, it may be brought thereafter. But, assuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract.

COMINT Sys. Corp. v. United States, 700 F.3d at 1382 (footnote omitted; alteration and emphasis in original); see also Per Aarsleff A/S v. United States, 829 F.3d at 1312; Comm'n Constr. Servs., Inc. v. United States, 116 Fed. Cl. 233, 261-62 (2014) ("[P]arties who have the opportunity to object to the terms of a solicitation containing patent errors or ambiguities and fail to do in a timely fashion waive their ability to subsequently raise the same objections. . . . The *Blue & Gold* waiver rule as extended by *COMINT* is simple: if there is a patent ambiguity or error in the solicitation, a plaintiff must seek redress in court prior to award.").

The Federal Circuit also explained in Bannum, Inc. v. United States:

Our waiver rule implements Congress's directive in the Administrative Dispute Resolution Act (ADRA) of 1996, Pub. L. No. 104-320, § 12, 110

Stat. 3870, 3874, that courts "shall give due regard to . . . the need for expeditious resolution" of protest claims. 28 U.S.C. § 1491(b)(3); *see Blue & Gold,* 492 F.3d at 1313. A waiver rule implements this statutory mandate by reducing the need for the "inefficient and costly" process of agency rebidding "after offerors and the agency ha[ve] expended considerable time and effort submitting or evaluating proposals in response to a defective solicitation." *Blue & Gold*, 492 F.3d at 1314 (internal quotation marks and citation omitted). In this context, clarity is not just readily achievable but important. Requiring that the prescribed formal routes for protest be followed (to avoid waiver) reduces uncertainty about whether the issue is joined and must be resolved, and thereby helps prevent both the wasted and duplicative expenses (of all bidders and the government) and the delayed implementation of the contract that would likely follow from laxer standards of timely presentation of solicitation challenges.

Bannum, Inc. v. United States, 779 F.3d 1376, 1380 (Fed. Cir. 2015) (alterations in original). The Federal Circuit in Bannum also emphasized that:

> The solicitations at issue and the governing regulations put Bannum on notice of the formal requirements for filing a "protest" that would trigger an agency obligation of response and prompt resolution. Bannum did not comply with those requirements; nor did it pursue other available means of formal protest (*e.g.,* to the GAO or the Court of Federal Claims) until after the awards. In these circumstances, it waived its solicitation challenges.

Id. (emphasis in original).

It is undisputed by the parties that MLS raised its objections regarding Port Tariff provisions with Navy before the close of the Solicitation. According to the joint stipulations: "On November 25, 2017, prior to the due date for receipt of proposals, MLS submitted to the Navy contracting officer a second agency-level pre-proposal protest under FAR 33.103 objecting to the Solicitation's port tariff provisions." (emphasis added). It, therefore, is evident that MLS met the requirement of Blue & Gold, which, as discussed above, instructed that

> a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims.

Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313. As noted above, the policy objectives underlining Blue & Gold are:

> In the absence of a waiver rule, a contractor with knowledge of a solicitation defect could choose to stay silent when submitting its first proposal. If its first proposal loses to another bidder, the contractor could then come

forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors. A waiver rule thus prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation.

Id. at 1314; see also COMINT Sys. Corp. v. United States, 700 F.3d at 1382.  Instead of trying to gain an advantage over its competitors, MLS tried to clarify, on behalf of itself and all other potential offerors, what, to MLS, seemed like an obvious problem, the Port Tariff provisions require the contractors to be agents, but the Solicitation did not permit the contractors to be agents of the Navy. MLS raised this potential issue to the Navy during both the question and answer portion of the Solicitation process and during its agency level protest. As noted above in Bannum:

> The solicitations at issue and the governing regulations put Bannum on notice of the formal requirements for filing a "protest" that would trigger an agency obligation of response and prompt resolution. Bannum did not comply with those requirements; nor did it pursue other available means of formal protest (*e.g.,* to the GAO or the Court of Federal Claims) until after the awards. In these circumstances, it waived its solicitation challenges.

Bannum, Inc. v. United States, 779 F.3d at 1380 (emphasis in original). Here, MLS filed its agency level protest in advance of the close of the Solicitation, but unlike the Federal Circuit's expectation in Bannum of an "agency obligation of response and prompt resolution," the Navy did not promptly respond to the agency level protest filed by MLS, and did not respond before proposal submissions were due. MLS filed its agency level protest on November 25, 2017, and without having received an answer from the agency, submitted its proposal on December 6, 2017. The Navy did not respond until on January 19, 2018 when it denied MLS' agency level protest, which was after December 13, 2017, the date proposals were due.

Despite acknowledging that MLS timely filed an agency level protest in advance of the close of the Solicitation, defendant nevertheless argues that MLS' "failure to diligently pursue its claims afterward waived its right to maintain its present protest." Defendant notes that after MLS filed its protest MLS submitted its proposal, MLS did not take any exceptions to the Solicitation in its proposal,[10] and also did not file a protest at the GAO or in the United States Court of Federal Claims before the Solicitation closed. Defendant stresses "MLS waited 47 days after the Solicitation closed before filing its GAO protest, which was dismissed as untimely on March 15, 2018," and that "[i]t was not until July 11, 2018, nearly four months after its GAO protest was dismissed, and two-and-a-half months

---

[10] The court notes that the Solicitation specifically provides that "[a]ny exception taken to line item descriptions or units of issue shall be submitted in writing to the Contracting Officer prior to the date of solicitation closing," and indicated that "[p]roposals that take exception to any term of the solicitation will not be considered for award; therefore, any exception to the Government's terms must be resolved prior to the solicitation closing date."

after it was awarded the Contract, that MLS filed this bid protest contesting the terms of the Solicitation." According to defendant, "MLS has not attempted to explain how its present protest could be timely given the long delay between the dismissal of its untimely GAO protest and its initiation of the present bid protest. Instead, it relies on its agency-level protest and is wholly silent on the delays that followed." (internal reference omitted). Defendant cites to CGI Federal, Inc. v. United States, Rex Service Corp. v. United States, and Digitalis Education Solutions, Inc. v. United States, to argue that a failure to diligently pursue a claim after denial of an agency level protest and/or a GAO protest can result in waiver.

In CGI, the United States Department of Health and Human Service's Centers for Medicare and Medicaid Services issued requests for quotes in order to issue contracts that would use the awardees to determine if Medicare claims had been correctly paid. See CGI Fed., Inc. v. United States, 779 F.3d 1346, 1347 (Fed. Cir. 2015). The Federal Circuit indicated if the contractor identified an overpayment, the agency would send a demand letter to the provider and repayment, and then pay the contractor a contingency fee. See id. In CGI, CGI protested the payment terms of the requests for quotes, contending that the terms violated certain statutory and regulatory provisions. See id. As noted by the Federal Circuit:

> Five different contractors bid on the 2014 RFQs, but CGI did not. Instead, before bidding closed, CGI filed a timely pre-award protest at the Government Accountability Office ("GAO") challenging the revised payment terms. While the GAO protest was pending, the bidding period closed. The GAO subsequently denied the protest. Three business days later, CGI filed a protest in the United States Court of Federal Claims.

Id. at 1348. In CGI, the Federal Circuit recognized that "CGI never submitted a bid in response to the 2014 RFQs and thus is not an actual bidder. CGI must therefore show that it was a prospective bidder at the time it filed its protest in the Court of Federal Claims. We hold that it has made such a showing." Id. As explained by the Federal Circuit:

> CGI was a prospective bidder when it promptly initiated and diligently pressed its protest in the GAO forum, which Congress has encouraged protestors to use before suing in court. Unsuccessful in the GAO, it immediately filed for relief in court. We do not think that Congress meant for a protestor in CGI's position to lose its entitlement to sue just because delays engendered by the GAO adjudicatory process pushed completion past the closing date for bid submissions. Concluding, as we do, that CGI filed a protest prior to the close of bidding and thereby established its prospective bidder status, and that CGI thereafter diligently pursued its rights, CGI has prospective bidder status to pursue its Court of Federal Claims protest.

Id. at 1351. Furthermore, in CGI, the Federal Circuit determined that "CGI retained its prospective bidder status throughout the pendency of its GAO protest because it was

continuously pursuing its challenge to the payment terms in the 2014 RFQs." Id. at 1349-50 (footnote omitted).

In drawing a contrast with the protestor in CGI, the Federal Circuit described the procedural history in Rex Service Corp. v. United States, 448 F.3d 1305 (Fed. Cir. 2006), as follows:

> Rex initially filed a pre-award protest with the agency. The agency denied its protest, and Rex, having not submitted a bid, did not pursue the matter further. The agency subsequently awarded the contract to another party and-two months after the award and three months after the agency denied its initial protest-Rex filed a post-award protest in the Court of Federal Claims, raising issues entirely different from those raised in its agency protest. We held that Rex was not a prospective bidder because it "could have bid, but chose not to."  We noted that in Rex's case, its pre-award agency protest was "not relevant" to determining its prospective bidder status.  We again noted that "'the opportunity to qualify either as an actual or a prospective bidder ends when the proposal period ends.'"  We held that "In the end, Rex did not submit a bid; nor did it file a timely bid protest in the Court of Federal Claims."

CGI Fed., Inc. v. United States, 779 F.3d at 1349 (citations omitted). The Federal Circuit in CGI continued:

> In *Rex,* the protestor waited nearly three months after the agency denied its initial protest before filing the protest at issue and, in the interim, the agency awarded the contract to another bidder. *Rex*, 448 F.3d at 1307. Here, CGI filed its Court of Federal Claims protest within three business days of receiving its dismissal from the GAO and before CMS [United States Department of Health and Human Service's Centers for Medicare and Medicaid Services] had awarded the contract. CGI, having secured prospective bidder status by filing its timely GAO protest, did not lose it in the three business days it took to file in the Court of Federal Claims.  We acknowledge that *Rex* explained that the timely filed agency protest was "not relevant to Rex's status" as a prospective bidder at the time that it filed its Court of Federal Claims protest. This, we conclude, is because Rex failed to continue to pursue its rights in a diligent fashion, and thus ceased to be a prospective bidder. Rex's agency denial was met with inaction. That inaction persisted for months, and during that time the government awarded the contract. By the time Rex filed its Court of Federal Claims protest, its agency protest was no longer relevant.

CGI Fed., Inc. v. United States, 779 F.3d at 1350-51 (footnotes omitted).  The Federal Circuit in CGI stated:

> The same cannot be said of CGI, which diligently and continuously pursued its rights in the GAO and then, immediately upon dismissal by the GAO, in

the Court of Federal Claims. Neither party disputes that CGI qualified as a prospective bidder on the day that it filed its GAO protest. Thus, it "achieve[d] prospective bidderhood" at that time. *MCI*, 878 F.2d at 365. The fact that-as *MCI, Federal Data*, and *Digitalis* all make clear-CGI's opportunity to *qualify* as a prospective bidder ends when the solicitation period ends does not doom CGI because it had already achieved prospective bidder status with its timely GAO protest. It seems equally clear that CGI retained its prospective bidder status throughout the pendency of its GAO protest because it was continuously pursuing its challenge to the payment terms in the 2014 RFQs.

CGI Fed., Inc. v. United States, 779 F.3d at 1349-50 (emphasis in original; footnotes omitted).

In Digitalis Education Solutions, Inc. v. United States, 664 F.3d 1380 (Fed. Cir. 2012), the protestor, Digitalis Education Solutions, Inc. (Digitalis) was a manufacturer of digital planetariums, and the Department of Defense published a notice on FedBizOpps of its intention to award a sole source contract to a company called Science First for the digital planetariums. See id. at 1383. After the Department of Defense awarded the contract to Science First on September 25, 2010, Digitalis initially complained, not to the Department of Defense, but to a member of Congress, who forwarded Digitalis' complaint to the Department of Defense. See id. The "Department responded to the Congressman stating that because Digitalis did not file a capability statement or otherwise protest the sole-source award, the Department would not consider Digitalis's objections." Id. Only after this rejection did Digitalis object directly to the Department of Defense on December 2, 2010, and then filed a protest at the United States Court of Federal Claims on December 6, 2010.  See id. The defendant in Digitalis argued that:

> Digitalis is not an "interested party" under 28 U.S.C. § 1491(b)(1) because it fails both prongs of the relevant test: it is not an actual or prospective bidder and it does not possess a direct economic interest. The government argues that Digitalis was not an "actual or prospective bidder" because it failed to submit a capability statement. It analogizes to *Rex Service* where we held that if a party does not bid during the bid period, it does not have standing regardless of any illegalities by the government in the bid process.

Digitalis Educ. Sols., Inc. v. United States, 664 F.3d at 1384. The Federal Circuit in Digitalis noted:

> We held that Rex Service did not satisfy either prong of the test for standing because it failed to submit a proposal during the prescribed time. Id. [Rex Service Corp. v. United States, 448 F.3d] at 1307–08. We noted that "in order to be eligible to protest, one who has not actually submitted an offer must be *expecting* to submit an offer prior to the closing date of the solicitation" and that the opportunity to become a prospective bidder ends when the proposal period ends. Id. at 1308 (quoting MCI, 878 F.2d at 365).

> We further held that Rex Service had no direct economic interest because it had no substantial chance to be awarded the contract due to its failure to submit a bid. Id. at 1308.
>
> We see no reason to limit this rule to competitive procurements. Indeed, the Court of Federal Claims has already extended it to sole-source contracts under similar facts. See Infrastructure Def. Techs. v. United States, 81 Fed. Cl. 375 (2008). In a sole-source award such as this one, the notice of intent issued by the government is analogous to a request for a proposal. Interested parties are invited to submit statements of capability in order to convince the government that it should hold a full competition for the contract rather than sole-source the contract to the proposed contractor. We therefore hold that in order to be an actual or prospective bidder, a party must submit a statement of capability during the prescribed period. Failure to do so also means that a party does not have the requisite direct economic interest because it cannot have a "substantial chance" of convincing the government to hold a formal competition and subsequently bid on the contract. Rex Serv., 448 F.3d at 1308.

Digitalis Educ. Sols., Inc. v. United States, 664 F.3d at 1385 (emphasis in original).

In all three cases, the Federal Circuit considered whether delay caused the protestor to lose its prospective bidder status. In commenting that delays of months prior to filing a protest in the United States Court of Federal Claims in both Rex Service and Digitalis, the Federal Circuit in CGI specifically noted that the lengthy delays caused the protestors to lose their "prospective bidder" status. See CGI Fed., Inc. v. United States, 779 F.3d at 1349, 1351. In none of the three decisions cited by defendant, however, had the protestor actually submitted a proposal. Therefore, the issue before the courts in the three cases turned on whether the protestors who had never submitted bids in response to the respective solicitations could be considered prospective bidders. Despite the issues MLS had with the Solicitation, MLS timely submitted a proposal without taking any exceptions to the Solicitation, and was an actual offeror when the Solicitation closed. In MLS' protest before the court, there is no debate about MLS' status as a bidder, specifically, that MLS timely filed a proposal with the Navy before the close of the Solicitation.

The defendant also points to the language in Blue & Gold that pursuant to 28 U.S.C. § 1491(b) (2018), "'the courts shall give due regard to the interests of national defense and national security and *the need for expeditious resolution of the action.*'" Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1313 (quoting 28 U.S.C. § 1491(b)(3)) (emphasis in original). The court notes, however, that MLS has a reasonable explanation for the time between when the MLS' GAO protest was dismissed and when MLS decided to file suit in this court.[11] As indicated above, the defendant points out that protestor did

---

[11] As noted above, the GAO protest was considered untimely by the GAO because the arguments in the agency level protest "were raised with our Office more than 10 days

not file suit in this court until July 11, 2018, nearly four months after MLS' GAO protest was dismissed and nearly seven months after the Solicitation closed. In its reply brief, MLS states that "[a]t the Navy's invitation, MLS sought to resolve its objections to the solicitation with the appropriate naval authorities over the course of several months." MLS states that after the GAO protest was dismissed,

> Navy counsel invited MLS to engage in discussions prior to filing this protest in an effort to resolve the issues MLS had raised in its protests to the Navy and GAO. Throughout March, April, May and June 2018, MLS and representatives of the Navy engaged in such discussions. Those discussions concluded on June 26, 2018 without agreement.

MLS' good faith discussions with the Navy,[12] and hope for a resolution, explains the delay between the dismissal of the GAO protest and MLS filing suit in the United States Court of Federal Claims. The court finds that MLS had not waived its challenge to the terms of the Solicitation when protestor filed its complaint in this court on July 11, 2018.

Next, defendant argues that protestor lacks standing "to maintain this bid protest because it is the awardee of a contract under the Solicitation. . . ." Intervenor echoes defendant's contention, arguing "[t]he Court lacks bid protest jurisdiction under 28 U.S.C. § 1491(b) over MLS' claims since they concern post-award contract administration matters. Such claims can only be heard pursuant to the Court's CDA jurisdiction under 28 U.S.C. § 1492(a)(2), not the Court's bid protest jurisdiction, upon which MLS' Complaint exclusively relies." MLS responds that "MLS has standing here despite the fact it is a contract awardee."

It is well established that "'subject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived.'" Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "[F]ederal courts have an independent obligation to ensure that they do not exceed the scope of their jurisdiction, and therefore they must raise and decide jurisdictional questions that the parties either overlook or elect not to press." Henderson ex rel.

---

after the protester had actual or constructive knowledge of adverse agency action, that is, when the Navy proceeded with the receipt of proposals without amending the RFPs and extending their deadline for proposals as requested by MLS." MLS-Multinational Logistic Servs., Ltd., B-415971 (citing 4 C.F.R. § 21.2(a)(3)). There is no comparable ten-day rule in the United States Court of Federal Claims.

[12] In the Navy's June 26, 2018 letter to MLS, the Navy emphasized that "[i]t is our intention to review your recommendation in the context of the overall acquisition strategy and solicitation development for the upcoming worldwide husbanding solicitation. We can assure you that the specific issue you raise will get significant contracting and legal attention."  Neither the defendant nor the intervenor challenges the authenticity or veracity of the letter provided by MLS regarding the Navy's conduct for the time between the GAO dismissal and MLS filing suit in this court.

Henderson v. Shinseki, 562 U.S. 428 (2011); see also Hertz Corp. v. Friend, 559 U.S. 77, 94 (2010) ("Courts have an independent obligation to determine whether subject-matter jurisdiction exists, even when no party challenges it." (citing Arbaugh v. Y & H Corp., 546 U.S. at 514)); Special Devices, Inc. v. OEA, Inc., 269 F.3d 1340, 1342 (Fed. Cir. 2001) ("[A] court has a duty to inquire into its jurisdiction to hear and decide a case." (citing Johannsen v. Pay Less Drug Stores N.W., Inc., 918 F.2d 160, 161 (Fed. Cir. 1990))); View Eng'g, Inc. v. Robotic Vision Sys., Inc., 115 F.3d 962, 963 (Fed. Cir. 1997) ("[C]ourts must always look to their jurisdiction, whether the parties raise the issue or not."). "The objection that a federal court lacks subject-matter jurisdiction . . . may be raised by a party, or by a court on its own initiative, at any stage in the litigation, even after trial and the entry of judgment." Arbaugh v. Y & H Corp., 546 U.S. at 506; see also Hymas v. United States, 810 F.3d 1312, 1317 (Fed. Cir. 2016) (explaining that a federal court must satisfy itself of its jurisdiction over the subject matter before it considers the merits of a case); Cent. Pines Land Co., L.L.C. v. United States, 697 F.3d 1360, 1364 n.1 (Fed. Cir. 2012) ("An objection to a court's subject matter jurisdiction can be raised by any party or the court at any stage of litigation, including after trial and the entry of judgment." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506)); Rick's Mushroom Serv., Inc. v. United States, 521 F.3d 1338, 1346 (Fed. Cir. 2008) ("[A]ny party may challenge, or the court may raise sua sponte, subject matter jurisdiction at any time." (citing Arbaugh v. Y & H Corp., 546 U.S. at 506; Folden v. United States, 379 F.3d 1344, 1354 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. denied, 545 U.S. 1127 (2005); and Fanning, Phillips & Molnar v. West, 160 F.3d 717, 720 (Fed. Cir. 1998))); Pikulin v. United States, 97 Fed. Cl. 71, 76, appeal dismissed, 425 F. App'x 902 (Fed. Cir. 2011).  In fact, "[s]ubject matter jurisdiction is an inquiry that this court must raise sua sponte, even where . . . neither party has raised this issue."  Metabolite Labs., Inc. v. Lab. Corp. of Am. Holdings, 370 F.3d 1354, 1369 (Fed. Cir.) (citing Textile Prods., Inc. v. Mead Corp., 134 F.3d 1481, 1485 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir.), cert. denied, 525 U.S. 826 (1998)), reh'g and reh'g en banc denied (Fed. Cir. 2004), cert. granted in part sub. nom Lab. Corp. of Am. Holdings v. Metabolite Labs., Inc., 546 U.S. 975 (2005), cert. dismissed as improvidently granted, 548 U.S. 124 (2006).

This court has jurisdiction to hear bid protests pursuant to 28 U.S.C. § 1491(b)(1) of the Tucker Act, which provides that this court has

> jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b)(1); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009). The Administrative Dispute Resolution Act of 1996, codified at 28 U.S.C. § 1491(b)(1)–(4), amended the Tucker Act to establish a statutory basis for bid protests in the United States Court of Federal Claims. See Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1330–32 (Fed. Cir. 2001).

The Tucker Act grants the United States Court of Federal Claims "jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. § 1491(a)(1) (2012). In order to have standing to sue as an "interested party" under this provision, a disappointed bidder must show that it suffered competitive injury or was "prejudiced" by the alleged error in the procurement process. See Todd Constr., L.P. v. United States, 656 F.3d 1306, 1315 (Fed. Cir. 2011) (To prevail, a bid protester must first "'show that it was prejudiced by a significant error' (i.e., 'that but for the error, it would have had a substantial chance of securing the contract).'" (quoting Labatt Food Serv., Inc. v. United States, 577 F.3d 1375, 1378, 1380 (Fed. Cir. 2009)); Blue & Gold Fleet, L.P. v. United States, 492 F.3d at 1317; see also Sci. Applications Int'l Corp. v. United States, 108 Fed. Cl. 235, 281 (2012); Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. 672, 693 (2010) ("In order to establish standing to sue, the plaintiff in a bid protest has always needed to demonstrate that it suffered competitive injury, or 'prejudice,' as a result of the allegedly unlawful agency decisions." (citing Rex Serv. Corp. v. United States, 448 F.3d at 1308; Statistica, Inc. v. Christopher, 102 F.3d 1577, 1580–81 (Fed. Cir. 1996); Vulcan Eng'g Co. v. United States, 16 Cl. Ct. 84, 88 (1988); Morgan Bus. Assocs., Inc. v. United States, 223 Ct. Cl. 325, 332 (1980))). In order to establish what one Judge on this court has called "allegational prejudice" for the purposes of standing, the bidder must show that there was a "substantial chance" it would have received the contract award, but for the alleged procurement error. See Linc Gov't Servs., LLC v. United States, 96 Fed. Cl. at 675; Hyperion, Inc. v. United States, 115 Fed. Cl. 541, 550 (2014) ("The government acknowledges that proving prejudice for purposes of standing merely requires "allegational prejudice," as contrasted to prejudice on the merits . . . ."); Bannum, Inc. v. United States, 115 Fed. Cl. 148, 153 (2014); see also Bannum, Inc. v. United States, 404 F.3d 1346, 1358 (Fed. Cir. 2005); Galen Med. Assocs., Inc. v. United States, 369 F.3d 1324, 1331 (Fed. Cir.), reh'g denied (Fed. Cir. 2004); Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2003); Statistica, Inc. v. Christopher, 102 F.3d at 1581; Archura LLC v. United States, 112 Fed. Cl. 487, 497 (2013); Lab. Corp. of Am. v. United States, 108 Fed. Cl. 549, 557 (2012). Because standing is a jurisdictional issue, this showing of prejudice is a threshold issue. See Corus Grp. PLC. v. Int'l Trade Comm'n, 352 F.3d 1351, 1357 (Fed. Cir. 2003); Myers Investigative & Sec. Servs., Inc. v. United States, 275 F.3d 1366, 1370 (Fed. Cir. 2002).

In the context of a pre-award bid protest, the United States Court of Appeals for the Federal Circuit has determined that to show the requisite "direct economic interest," and, therefore, to be an "interested party" under the Tucker Act, the protestor has to have suffered a "'non-trivial competitive injury which can be redressed by judicial relief.'" See Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362–63); see also COMINT Sys. Corp. v. United States, 700 F.3d at 1383 n.7 ("[I]n Weeks Marine this court specifically held that the 'non-trivial competitive injury' standard was applicable to 'a *pre-award* protest.'" (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362)) (emphasis in original); MVS USA, Inc. v. United States, 111 Fed. Cl. 639, 647 (2013); Miles Constr., LLC v.

United States, 108 Fed. Cl. at 797. This is a lower standard than the "substantial chance" standard used in post-award bid protests, but still requires a "showing of *some* prejudice." Orion Tech., Inc. v. United States, 704 F.3d at 1348-49 (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362) (emphasis in original).

As explained by the United States Court of Federal Claims in Digitalis Education Solutions, Inc. v. United States:

> Only an "interested party" has standing to challenge a contract award. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307 (Fed. Cir. 2006). An interested party is an actual or prospective bidder whose direct economic interest would be affected by the award of the contract. *Id.* Thus, a party must show that it is 1) an actual or prospective bidder and 2) that it has a direct economic interest. "[I]n order to be eligible to protest, one who has not actually submitted an offer must be expecting to submit an offer prior to the closing date of the solicitation." *MCI Telecomms. Corp. v. United States*, 878 F.2d 362, 365 (Fed. Cir. 1989). To prove a direct economic interest, a party must show that it had a "substantial chance" of winning the contract. *Rex Serv.*, 448 F.3d at 1308.

Digitalis Educ. Solutions, Inc. v. United States, 664 F.3d at 1384; see also Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001), cert. denied, 534 U.S. 113 (2002); Centech Grp., Inc. v. United States, 78 Fed. Cl. 496, 503-504 (2007).

Defendant and intervenor argue that MLS cannot satisfy the interested party standard, first because MLS received a contract award. A number of decisions by judges of the United States Court of Federal Claims support the defendant's and the intervenor's argument that awardees of contracts can only bring claims under the court's CDA jurisdiction, see 41 U.S.C. § 7101 et seq. (2018), and not pursuant to the court's bid protest jurisdiction. See 28 U.S.C. § 1491(b)(1). For example, defendant and intervenor cite to Kellogg Brown & Root Services, Inc. v. United States, 117 Fed. Cl. 764 (2014). The Kellogg Brown & Root court indicated that the case originated from a solicitation to conduct closeout activities for Kellogg Brown & Root Services, Inc., which the court noted was commonly referred to as the LOGCAP III Contract. See id. at 765. The Kellogg Brown & Root court explained that "[u]nder LOGCAP III, KBR provided support services and logistics to the United States Army in connection with the wars in Iraq and Afghanistan. The contract was largely conducted on a cost-reimbursement basis. The performance period for the contract ran from December of 2001 through December 13, 2011." Id. at 766. The Kellogg Brown & Root court noted that the LOGCAP III Contract did not address how its closeout would be conducted after the end of contract performance. The Kellogg Brown & Root court indicated that

> [a]lthough there were discussions prior to the end of the contract, no final agreement regarding closeout was reached before the end of contract performance in December, 2011. The LOGCAP III closeout activities had since that time been paid for under a series of modifications to Task Order

25

160, which had been issued December 10, 2010, to create a small program management office unrelated to closeout.

Id. (internal references omitted and footnote omitted). Subsequently, the Army proposed Kellogg Brown & Root submit a firm-fixed price, rather than a cost-reimbursement, proposal for the LOGCAP III Contract closeout. Kellogg Brown & Root objected, and rather than respond to the Army's proposal, filed a protest with the GAO, and after the GAO protest was dismissed, filed a bid protest in the United States Court of Federal Claims. See id. at 766-67. In this court, the government argued that Kellogg Brown & Root, as a contract awardee, was obligated to resolve any disputes related to the closeout of the LOGCAP III Contract under the procedures contained in the CDA. The Judge of the United States Court of Federal Claims in Kellogg Brown & Root concluded:

> The Court is not persuaded that this matter comes under our bid protest jurisdiction. First, the Court agrees with the line of cases holding that when a party brings a challenge in our court to an agency action which affects that party because it is a contractor and not because it is (or might be) an offeror, the only vehicle it may use is the CDA. Although most federal contractors were at one point offerors for the contracts they received, once the contracts are awarded their interests in disputes with the government are those of contractors, not offerors. Thus the CDA, which mandates that "[e]ach claim by a contractor against the Federal Government relating to a contract shall be submitted to the contracting officer for a decision," 41 U.S.C. § 7103(a)(1), must be followed to ripen the matter for court review. See 28 U.S.C. § 1491(a)(2).

Kellogg Brown & Root Servs., Inc. v. United States, 117 Fed. Cl. at 769 (footnote omitted). The Kellogg Brown & Root court further limited when awardees could bring bid protest claims by indicating that

> [t]he Court does not believe that the terms "bids or proposals" are in the plural by accident. Rather, they are used because the purpose of this provision is to allow protests to the terms of competitive solicitations, in which a contract may be lost to another bidder due to an improper advantage. The provision is not designed to allow a party to object to a request for a proposal directed to that party alone and no others.

Id. at 770 (footnotes omitted). Notably, the Kellogg Brown & Root court wrote in a footnote that: "Of course, when a proposed corrective action effectively restores an awardee to the status of bidder by requiring it to compete again for a contract award, this action may be challenged by the former awardee in a bid protest." Id. at 769 n.5.

In addition to Kellogg Brown & Root Services, defendant and intervenor cite to: TransAtlantic Lines LLC v. United States, 126 Fed. Cl. 756 (2016); ITtility, LLC v. United States, 124 Fed. Cl. 452 (2015); Trailboss Enterprise, Inc. v. United States, 111 Fed. Cl. 338 (2013); Diversified Maintenance Systems, Inc. v. United States, 103 Fed. Cl. 431

(2012); and <u>Outdoor Venture Corp. v. United States</u>, 100 Fed. Cl. 146 (2011), cases in which the courts found the contractor lacked standing to bring a bid protest action. In <u>TransAtlantic Lines LLC v. United States</u>, 126 Fed. Cl. 756, in 2012, the United States Transportation Command (USTRANSCOM) awarded 28 offerors indefinite delivery/indefinite quantity contracts to provide international cargo transportation and distribution services for Department of Defense cargo. <u>See id.</u> at 757. After the contracts were set to expire, USTRANSCOM decided to pursue the next generation of cargo contracts, but due to post-award protests at the GAO, USTRANSCOM issued sole source bridge contracts for a six month term and a five percent increase for carrier rates. <u>See id.</u> The <u>TransAtlantic</u> court noted that the same day that USTRANSCOM decided on the sole source bridge contracts, TransAtlantic contacted to USTRANSCOM to "inquire whether TransAtlantic would be allowed to add inland trucking rates, *i.e.,* 'late rates,' on the West Azores route during the six-month extension period. USTRANSCOM decided that TransAtlantic would not be able to add the inland trucking rate, because the Government was not 'refreshing rates at this time.'" <u>Id.</u> (footnote and internal reference omitted). TransAtlantic subsequently filed a bid protest in the United States Court of Federal Claims arguing USTRANSCOM's failure to accept their proposed land rates was arbitrary and capricious. <u>See id.</u> The <u>TransAtlantic</u> court noted that:

> TransAtlantic returned the executed bridge contract to USTRANSCOM, thereby accepting the terms therein. TransAtlantic's claims concerning USTRANSCOM's rejection of TransAtlantic's proposed land rates are disputes that concern the "late rates" provisions-Paragraphs 1.1, 1.41–1.42, and 1.5-of the USC-7, that were incorporated by reference into the bridge contract. Therefore, TransAtlantic's dispute is a matter a contract administration, that must be adjudicated pursuant to the CDA.

<u>Id.</u> at 763-64. Notably, the <u>TransAtlantic</u> court indicated that "TransAtlantic did not claim that USTRANSCOM's bridge contract violated CICA or that USTRANSCOM must conduct a new competition," but quoting the <u>TransAtlantic</u> defendant's brief, noted that "TransAtlantic 'seeks to renegotiate a small piece of the contract.'" <u>Id.</u> at 763. Crucially, the <u>TransAtlantic</u> court noted that "TransAtlantic does not dispute that it could resolve this matter with the Government through the CDA claim process." <u>Id.</u>

In <u>ITility, LLC v. United States</u>, 124 Fed. Cl. 452, the protestor, ITility, LLC (ITility), was awarded a contract by the Air Force in 2013, which sought program management support for the Air Force's Air Combat Command A6C–T User Defined Operational Picture (UDOP) Rapid Innovation Funds effort. <u>See id.</u> at 455. The <u>ITility</u> court explained that

> [a]fter numerous disputes between ITility and the Air Force with regards to ITility's performance under the contract-including the Air Force's issuance of three deficiency notices, a corrective action request, and a cure notice-the Air Force finally issued a stop-work order on the contract on June 27, 2014, and the period of performance was allowed to expire. Then, on November 5, 2014, the Air Force's Contracting Officer, issued an interim

> Contractor Performance Assessment Report (CPAR) concerning the contract.

Id. In response, ITility "claimed that it was not responsible for the failed contract, instead arguing that the Air Force was to blame because the Air Force had 'never given' ITility 'access to the current UDOP servers within [the Air Force's] sole possession,' which was necessary in order for ITility 'to perform work under the [c]ontract.'" Id. (alterations in original). ITility subsequently filed a bid protest complaint in the United States Court of Federal Claims. See id. The ITility court explained:

> The first two counts of the complaint are challenges to the substance of the Air Force CPAR. In the first count, ITility alleges that the assessment of its contract performance "includes inaccurate and misleading facts, as well as material omissions," in violation of 48 C.F.R. § 42.1503(b). In the second count, plaintiff contends that the official who reviewed the assessment failed to "consider disagreements between the parties," in violation of 48 C.F.R. § 42.1503(d), and failed to ensure that the record contained accurate information based on objective facts, reiterating the alleged violation of 48 C.F.R. § 42.1503(b). Because these counts allege violations of a regulation in connection with a procurement, ITility maintains that they may be brought under our court's 28 U.S.C. § 1491(b)(1) bid protest jurisdiction.

ITility, LLC v. United States, 124 Fed. Cl. at 458 (internal citations omitted). The ITility court rejected the protestor's arguments, concluding:

> There are several problems with this argument. Perhaps the most fundamental problem is that, while the CPAR was indeed created "in connection with a procurement," 28 U.S.C. § 1491(b)(1), the procurement in question was one in which ITility performed as the contractor, not one in which plaintiff was merely an offeror or prospective offeror. As the Court has explained, see Kellogg Brown & Root Servs., Inc. v. United States, 117 Fed. Cl. 764, 768-69 (2014), a long line of our cases has held that the "interested party" standing to bring a bid protest does not extend to the complaints of contractors concerning the administration of contracts they have been awarded and performing. When a party objects to a decision by a federal agency that was made because that party was a government contractor, and not because the party was an offeror for a contract to be awarded, then the matter is properly viewed as seeking "relief arising under or relating to the contract" held by the party, 48 C.F.R. § 2.101, rather than presenting a circumstance in which the party's "direct economic interest would be affected by the award of the contract or by failure to award the contract," 31 U.S.C. § 3551(2) Although a procurement may run through "contract completion and closeout," see Distributed Sols., Inc. v. United States, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (quoting what was then 41 U.S.C. § 403(2), now found at 41 U.S.C. § 111), the impact of a contract award (or the failure to award) ceases to be relevant once a party becomes the contractor for that procurement. At that stage, the interest of the party

changes from that of an offeror to that of a contractor, and the CDA becomes the vehicle for resolving disputes.

ITility, LLC v. United States, 124 Fed. Cl. at 458 (citing Kellogg Brown & Root Servs. v. United States, 117 Fed. Cl. at 769–70) (footnote omitted).

In Trailboss Enterprise, Inc. v. United States, 111 Fed. Cl. 338, the Air Force issued a solicitation in 2012, for transient alert services, with a requirement that offerors hold their pricing offers firm for 90 calendar days after the date specified for final receipt of offers.  Trailboss submitted an offer on September 21, 2012, agreeing to hold its prices for the 90 day limit, and Trailboss was awarded a contract on November 14, 2012. See id. at 340. The Air Force issued a stop work order due to a protest by another offeror and took corrective action on January 14, 2013.  See id.

> On January 16, 2013, Trailboss informed the Air Force that the pricing contained in its initial offer was no longer valid because 90 days had passed and Trailboss no longer was willing to perform at the price it initially offered. On January 18, 2013, the Air Force informed Trailboss that, notwithstanding Trailboss's interpretation of its firm price offer, the Air Force intended to retain Trailboss as the contractor and to hold it to the September price.

Id. In response, Trailboss filed a bid protest complaint in the United States Court of Federal Claims seeking to enjoin the Air Force from forcing Trailboss to compete under the contract and "a declaratory judgment that the Air Force's decision to award the contract to Trailboss and to require it to perform under its terms is arbitrary and capricious, an abuse of discretion, and is otherwise not in accordance with law." Id. at 339. The Trailboss court wrote:

> Here, Trailboss won the contract on November 14, 2012, well within the 90–day period for which it agreed to hold open its offer. Since the Air Force never terminated-or even expressed intent to terminate-Trailboss's contract, Trailboss's claim concerning the 90–day firm offer period is a matter of post-award contract administration governed by this court's contract dispute jurisdiction. Accordingly, Trailboss, as the contract awardee lacks standing under the bid protest provisions of 28 U.S.C. § 1491(b)(1) to challenge the terms of its contract. Trailboss's complaint must be dismissed to the extent it is based on this courts bid protest jurisdiction.

Trailboss Enter., Inc. v. United States, 111 Fed. Cl. at 341.

In Diversified Maintenance Systems, Inc. v. United States, 103 Fed. Cl. 431, the Navy awarded a contract to Diversified Maintenance Systems, Inc. (DMS) for a job order contract to provide services in support of Naval Support Activity Panama City. See id. at 432. After contract award,

> [t]he Navy informed DMS that the subject contract had been solicited and awarded with the wrong specifications. For that reason, the Navy requested that DMS agree to substitute new specifications for those that had been set

forth in the solicitation. DMS agreed to accept the new specifications without any adjustment in contract price and also entered into several other agreements with the Navy regarding the administration and performance of the contract.

Id. at 432-33. DMS performed under the contract, but asserted that the Navy had withheld payments after performance on specific task orders, based on delays that allegedly were caused by the government's mismanagement of the job order contract. See id. at 433. Unable to resolve the issue with the contracting officer, the protestor filed a bid protest action in the United States Court of Federal Claims. See id. In its bid protest complaint DMS stated:

> DMS asserts that the Navy has breached the express terms of its contract with DMS. Plaintiff also alleges that the Navy has breached its implied duties of good faith and cooperation, and has effected a cardinal change to the requirements of the job order contract. DMS requests damages in the amount of $614,142.40, which represents the difference between the amount billed by DMS for work performed under the contract and the amount actually paid to DMS by the Navy. DMS also requests a preliminary injunction ordering the immediate payment of all invoices submitted by DMS to the Navy, as well as a preliminary injunction invalidating all claim waivers on delivery orders.

Id. (footnote omitted). The DMS court noted that the DMS protestor did not "assert that it is challenging a solicitation or the award or proposed award of a contract. Rather, DMS argues that the claims set forth in its complaint are based upon alleged violations of statutes or regulations 'in connection with a procurement.'" Id. at 435.

The Diversified Maintenance Systems court determined:

> Here, DMS is not an actual or prospective bidder or offeror; on the contrary, plaintiff was awarded the subject contract before the occurrence of any of the events that form the basis of its claims in this suit. This court has explained that a contractor challenging the administration or management of its contract is not a disappointed bidder for purposes of this court's bid protest jurisdiction:
>
> > The court does not see how a plaintiff asserting claims pertaining to a contract it has made with the government could be a "disappointed bidder" for bid protest purposes. Rather, such a plaintiff is a contractor asserting a claim "relating to a contract" and is subject to the [CDA] jurisdiction of this court, as set forth in 41 U.S.C. § 609. Because plaintiffs . . . received contract awards under the solicitation complained of, they are not disappointed bidders and do not have standing to assert this protest.

Diversified Main. Sys., Inc. v. United States, 103 Fed. Cl. at 436 (quoting ABF Freight Sys., Inc. v. United States, 55 Fed. Cl. 392, 397 (2003)) (alterations in original). As noted by the court in Diversified Maintenance Systems, the protestor did not dispute the fact that its job order contract was a contract which fell within the category of either an express or implied-in-fact contract as set forth in the CDA.  See id. at 435. Moreover, the protestor did not assert it was challenging a solicitation or the award of a contract. See id.

In Outdoor Venture Corp. v. United States, 100 Fed. Cl. 146, the protestor, Outdoor Venture Corporation (OVC), brought a post-award bid protest in the United States Court of Federal Claims, pursuant to a solicitation issued by the Defense Logistics Agency Troop Support (DLA) for which OVC was awardee of an indefinite delivery/indefinite quantity contract for two man combat tents See id. at 148. Prior to OVC filing suit in this court, a disappointed bidder protested the outcome at the GAO, causing the DLA to stay OVC's performance. The GAO referred the protest to the Small Business Authority (SBA), which sought information about OVC's status as a small business concern. Due to clerical errors, OVC did not timely appeal an SBA determination to the SBA's Office of Hearings and Appeals. See id. In response, OVC filed a complaint in this court. As indicated in the court's opinion:

> OVC requests that the court "declare that any termination of the contract award to OVC without a reopening of the [s]ize [d]etermination by [SBA] pursuant to 13 C.F.R. § 121.1009(b) would be arbitrary and capricious." OVC further requests that the court "enjoin defendant from terminating the award to OVC and direct[ ] that [SBA] reopen the OVC [s]ize [d]etermination."

Outdoor Venture Corp. v. United States, 100 Fed. Cl. at 150 (alterations in original; internal citations omitted). The Outdoor Venture Corp. court first determined that "Contract awardees such as OVC must instead bring contract claims pursuant to the Contract Disputes Act of 1978. . . ." Outdoor Venture Corp. v. United States, 100 Fed. Cl. at 152 (alterations in original).  The Outdoor Venture Corp. court emphasized that: "'[P]ure contract claims are not appropriate in a bid protest, even if clothed in the guise of a protest of an alleged statutory violation occurring in relation to a procurement.'" Id. (quoting Frazier v. United States, 79 Fed. Cl. 148, 160 (2007)) (alteration in original). The Outdoor Venture Corp. court acknowledged cases in which

> "[t]his Court has held that where a plaintiff, as the contract awardee, files a protest challenging an agency's decision to resolicit a proposal, the plaintiff's protest is in the nature of a pre-award claim." Ceres Gulf, Inc. v. United States, 94 Fed. Cl. 303, 315 (2010) (internal quotations omitted). In each of the cases cited by plaintiff, this court found that contract awardees had standing to bring pre-award bid protests because the government resolicited or began to resolicit the contract.

Outdoor Venture Corp. v. United States, 100 Fed. Cl. at 153 (citations omitted). The Outdoor Venture Corp. court, however, found that:

In this case, OVC's award has been stayed, but OVC does not allege that the government has resolicited the contract or that it intends to do so. Because there has been no resolicitation-as there was in the cases cited by plaintiff-OVC's protest is not in the nature of a pre-award claim. Therefore, OVC has failed to establish that it is an interested party with standing to bring this bid protest.

Id. (internal references omitted). The cases discussed immediately above all reflect that in order for a contractor to have standing to bring a bid protest challenge in this court, the contractor must demonstrate that its claims do not relate to contract performance, but instead relate to a challenge to the underlying solicitation.  As noted by both the Kellogg Brown & Root court and the Outdoor Venture Corp. court, one way a contract awardee could demonstrate standing is if "the government resolicited or began to resolicit the contract," Outdoor Venture Corp. v. United States, 100 Fed. Cl. at 153, or "when a proposed corrective action effectively restores an awardee to the status of bidder by requiring it to compete again for a contract award, this action may be challenged by the former awardee in a bid protest." Kellogg Brown & Root Servs., Inc. v. United States, 117 Fed. Cl. at 769 n.5.

In contrast to the cases cited above by defendant and intervenor, other decisions in the United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims have found contract awardees can have standing to bring a bid protest claim, provided that corrective action has been taken. For example, in Systems Application & Technologies, Inc., 691 F.3d 1374 (Fed. Cir. 2012), the United States Court of Appeals for the Federal Circuit considered the situation in which protestor, Systems Application & Technologies, Inc., (SA–TECH), the contract awardee for aerial target flight and maintenance services, protested the Army's decision to take corrective action instead of upholding SA–TECH's award. See id. at 1377. After SA-TECH was awarded the contract, a disappointed bidder filed a protest at GAO alleging the Army improperly had added a new requirement to the solicitation, and then filed a supplemental protest. The GAO attorney informed the Army of the merit to the supplemental protest, and the Army contacted the parties and indicated: "After review of the supplemental issues, **the Army has determined that it is in its best interest to take corrective action**. The Army intends to terminate the contract awarded to SA–TECH so that it can reopen the original solicitation." Id. at 1379 (emphasis in original). SA-TECH filed a bid protest in the United States Court of Federal Claims, alleging that the Army's decision to take corrective action was arbitrary, capricious, and unreasonable. The Court of Federal Claims found jurisdiction under 28 U.S.C. § 1491(b)(1). See Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1380. The Federal Circuit indicated that:

The trial court also found that SA–TECH had demonstrated proper standing and ripeness. On the merits, the Court of Federal Claims found that the Army's decision to take corrective action was arbitrary, capricious, and an abuse of discretion. The trial court also granted SA–TECH's request for injunctive relief, which prohibited the Army from implementing the proposed corrective action.

Id. (citations omitted). The Federal Circuit in Systems Application & Technologies indicated:

> In this case, SA–TECH objected to a solicitation and alleged violations of statutes and regulations governing the procurement process. The Army has not shown that this protest has no 'connection with a procurement.' Rather SA–TECH's complaint specifically challenged the Army's announced decision to amend or revise the solicitation-an unambiguous objection 'to a solicitation' covered by the Tucker Act.

Id. at 1381. The Federal Circuit continued: "In this case, the Army had not yet implemented the corrective action. Moreover, SA–TECH was the contract awardee. Neither of these facts are material to the question of jurisdiction," as the Federal Circuit concluded: "This court has made clear that bid protest jurisdiction arises when an agency decides to take corrective action even when such action is not fully implemented." Id. The Federal Circuit determined that:

> SA–TECH's attempt to enjoin the government from terminating its contract did not transform its otherwise proper protest under the Tucker Act into a claim which could only be adjudicated under the Contract Disputes Act and its concomitant procedural requirements. This court confronted and rejected a similar argument in Turner Construction, 645 F.3d at 1387-88. A request for injunctive relief regarding the government's termination of a contract concerns the scope of the Court of Federal Claims' equitable powers; it is not an issue of Tucker Act jurisdiction. Id. at 1388. Thus, the Court of Federal Claims properly exercised its jurisdiction under the Tucker Act as SA–TECH both objected to a solicitation and alleged violation of statute or regulation in connection with a procurement.

Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1381-82.

Similarly, in CBY Design Builders v. United States, 105 Fed. Cl. 303 (2012), the Army Corps of Engineers (the Corps) issued a solicitation for a permanent canal project in New Orleans to prevent future flood damage. See id. at 309. On April 13, 2011, CBY Design Builders (CBY) was awarded a contract, however, prior to award, one of the other offerors had raised an organizational conflict of interest (OCI) regarding a former employee of the Corps. See id. at 317-18. After the Corps found no merit to the OCI, another offeror raised a separate OCI allegation, regarding the same employee related to a possible violation of the Procurement Integrity Act (PIA). The contracting officer "concluded that the alleged PIA violations would have had no impact on the selection of CBY for the contract award, and found no evidence to support PCCP's [the offeror's] allegations." Id. at 319. Subsequently, on April 26, 2011, both offerors who raised the possible OCI issues filed protests at the GAO. See id. The CBY court noted that

> protests filed with the GAO resulted in the August 4, 2011 recommendation that the Corps conduct a new OCI investigation, amend the solicitation to clarify the approach to price, conduct discussions regarding the issues in

those protests "if necessary," "accept and evaluate revised proposals, and make a new source selection decision consistent with" the GAO decision. After the third OCI investigation was completed, on October 21, 2011, the Corps contacted the five offerors in the competitive range to inform them that no OCI existed; that "[i]n accordance with the recommendation from GAO, and in order to address the current needs of the agency, it is [the Corps's] intent to request, accept, and evaluate new proposal revisions from all short listed offerors"; and that it "intends on issuing an Amendment to the solicitation which will make" at least eight changes to the solicitation. The following week, per its proposed schedule, the Corps sent a draft of the proposed amendment to the offerors, which was to be issued in final form one month later after comments were to have been received and considered. One week later, on November 4, 2011, CBY filed its protest here.

CBY Design Builders v. United States, 105 Fed. Cl. at 332-33 (internal references omitted). The CBY court summarized situations in which contract awardees were able to purse bid protest claims after corrective action was taken, but no new contract had been awarded:

> [I]n *Centech Group* our court rejected the argument that corrective action in which a contract award was suspended and the solicitation amended for a new competition was not ripe until an award was made to a party other than the awardee protesting the action. *Centech Grp., Inc. v. United States,* 78 Fed. Cl. 496, 505 (2007). The court explained that the corrective action was "distinct from any future evaluation and award" and involved "different controversies than those which may arise from the new evaluation and award in the post-award landscape." *Id.* In *Ceres Gulf*, the same ripeness argument was rejected in a case differing from *Centech Group* only in that the contract award was terminated. *Ceres Gulf, Inc. v. United States,* 94 Fed. Cl. 303, 317 (2010). The relevant decision to be consummated for purposes of review was found to be the decision to *conduct* a new competition, not the decision to award a contract under the second competition. *Id.* Similarly, our court in *Sheridan Corp.* found corrective action, in the form of a request for revised proposals, final for purposes of a bid protest, as it was the rationale for having the new competition that was at issue. *Sheridan Corp. v. United States,* 95 Fed. Cl. 141, 150 (2010). In *Jacobs Technology Inc.,* our court followed the reasoning of *Ceres Gulf*, finding the decision to re-solicit a contract the plaintiff had already won to be a final decision "which effectively voided its previous decision."

CBY Design Builders v. United States, 105 Fed. Cl. at 333 (quoting Jacobs Tech. Inc. v. United States, 100 Fed. Cl. 173, 177 (2011)). The CBY court agreed with the above quoted cases in finding "that corrective actions requiring an awardee to compete a second time for a contract are ripe for our review." Id.  The CBY court determined:

The Court agrees with this now-long list of precedents which hold that corrective actions requiring an awardee to compete a second time for a contract are ripe for our review. The relevant decision that must be consummated for our purposes, is the decision to have another competition for the award. It is not disputed that this competition will be held if plaintiff's protest fails. Absent this corrective action decision, CBY would either be performing the contract today, or defending its award in a bid protest initiated by the intervenors. Thus, the decision to take corrective action has had legal consequences, precluding plaintiff from performing the contract or resolving the propriety of its award. No additional factual development is needed for the alleged arbitrariness concerns not the second evaluation process, but rather the decision to undertake that process. Entertaining plaintiff's protest would not "inappropriately interfere with further administrative action," for the simple reason that if the decision to recompete the contract were an arbitrary one, there is no need for any further such action. Withholding judicial review of the corrective action decision would result in hardship to plaintiff, assuming, as we must, that its well-pled allegations are true, as the benefits under the contract already awarded to CBY would be arbitrarily delayed while plaintiff was needlessly forced to expend additional resources to attempt to win the contract a second time.

Id. at 333-34 (citations omitted).

Like the Federal Circuit's decision in Systems Application & Technologies, the CBY court indicated that an awardee of a contract could still challenge a solicitation under certain circumstances, typically involving corrective action by the agency and the termination of awardee's contract. In Systems Application & Technologies, it was the Army's decision to terminate the contract awarded to SA–TECH and reopen the solicitation that convinced the Federal Circuit that SA-TECH could properly bring a bid protest in the United States Court of Federal Claims. In CBY, the Corps decided to take corrective action to amend the solicitation. Even though CBY filed its protest before the revised solicitation was issued, the fact that corrective action was taken, and, therefore, CBY lost its contract award, was sufficient for the United States Court of Federal Claims to find CBY was an interested party.

The court notes that each of the three grounds on which MLS based its agency level protest could have, but did not, result in corrective action before MLS was an awardee of the Contract and received, and performed, task orders under the Contract. As indicated above, in its agency level protest, MLS argued:

1. The Solicitation's provisions concerning Port Tariff items are contrary to the regulations of the Ports. Port regulations require that Port Tariff items be obtained by the owner of the vessel or an authorized agent of the owner. The Solicitation expressly states that the HSP contractor is NOT the agent of the Navy. It is therefore impossible for the HSP contractor to perform according to the terms of the Solicitation. Thus, the Solicitation does not

35

state the Navy's actual requirements for Port Tariff items. The Solicitation must be revised so that either a.) the Navy deals directly with the Port for Port Tariff items, as historically has been the Navy's practice, or b.) to make the HSP contractor the agent of the Navy for purposes of obtaining Port Tariff items on behalf of the Navy.

2. The Solicitation also requires the HSP contractor to agree to terms and conditions beyond those covered by a Port tariff, but that the Navy will only pay the HSP the Port Tariff amount. The Solicitation must be revised to allow the HSP to price these additional terms and conditions.

3. Some of the Navy's terms and conditions in the Solicitation are contrary to the Ports' regulations in other respects. For example, Ports' regulations provide that the vessel owner is liable for damage done by the vessel and fines imposed on the vessel. But this Solicitation provides that the HSP, not the Navy, is liable for such things. Although this Solicitation treats a Port as the subcontractor of the HSP, the Ports have refused to comply with requirements this Solicitation imposes on subcontractors. The Solicitation must be revised to eliminate the terms and conditions that are contrary to the Ports' regulations.

(capitalization in original). For all three grounds, MLS emphasized to the agency that "[t]he Solicitation must be revised. . . ." By filing a pre-award bid protest in this court, MLS, now performing as a contractor pursuant to the Solicitation, its awarded Contract, and its awarded task orders, is attempting to convince the Navy to take corrective action, which the Navy did not take before awarding the contracts pursuant to the Solicitation. The relief that MLS now seeks, revision of the Solicitation, would cause MLS and the other current contractors to lose their contracts with the Navy for husbanding services, as well as the ability to bid on, and receive, further task orders.

MLS' bid protest complaint in this court begins by alleging:

MLS-Multinational Logistic Services Ltd ("MLS") protests the terms of a solicitation as contrary to applicable law and impossible to perform, prejudicing MLS by preventing MLS from offering its best terms in a proposal under the solicitation and from having a fair opportunity to compete for the contract and task orders under it. MLS seeks declaratory and injunctive relief to the effect that the solicitation must be revised to be consistent with applicable law and so that MLS will have a fair opportunity to compete for award of a contract and task orders under it.

In the section titled: "Requests for Relief," MLS' complaint seeks:

1. A declaratory judgment that the Solicitation's Port Tariff provisions are in violation of applicable law and regulations, and must be revised so that its Port Tariff provisions are consistent with applicable laws and regulations, and to allow MLS and other offerors to compete on a fair and equal basis for award of a contract under the Solicitation and for

task orders thereunder. The Solicitation's Port Tariff provisions must be revised so that they either: 1) provide for the Navy to contract directly with the Port for Port Tariff items, as the Navy has done in the past; or 2) make the HSP the Navy's agent authorized to contract with the Port on behalf of the Navy and to bind the Navy.

2. A preliminary injunction and permanent injunction enjoining the United States and each and all of its officers, agents, servants, employees, and attorneys, and all those persons acting in concert or participation with any of them, and in particular the Department of the Navy and the Contracting Officer, and requiring them to revise the Solicitation so that its Port Tariff provisions are consistent with applicable laws and regulations, and to allow MLS and other offerors to compete on a fair and equal basis for award of a contract under the Solicitation and for task orders thereunder. Specifically, the Solicitation's Port Tariff provisions must be revised so that they either: 1) provide for the Navy to contract directly with the Port for Port Tariff items, as the Navy has done in the past; or 2) make the HSP the Navy's agent authorized to contract with the Port on behalf of the Navy and to bind the Navy.

(capitalization in original).

The court believes that the relief that MLS seeks in its bid protest complaint is more consistent with a pre-award protest seeking to change the terms of the solicitation in advance of contract award, than a post-award protest seeking to redefine the terms of an already awarded and operative contract, as reflected in the some of the cases discussed above. The court notes that MLS did not file its protest in this court until after contracts were awarded and MLS was performing task orders under its Contract. The court recognizes that MLS did try to raise its concerns in advance of making its offer in response to the Solicitation and before receiving a contract award. Despite MLS' actions, however, the Navy did not take corrective action before contract awards, and has not yet done so, either as a result of MLS' agency level protest, the GAO protest, the protest currently before the court, or at any time before or after contracts and task orders were awarded. Moreover, performance of the contracts and task orders remains ongoing. The Navy has made clear to MLS and to the court that corrective action is not warranted at this time.

There are some similarities between MLS and the protestors in Systems Application & Technologies and CBY, cases in which corrective action was taken by the respective agencies and the protestors' contracts were terminated. If MLS is correct and the Port Tariff provisions in the Solicitation need revision, MLS and the other current contract awardees would lose their contracts and their task orders, requiring the Navy, MLS, and the contract holders to go through the solicitation and contract award process again. The courts in Systems Application & Technologies and CBY emphasized that the act of taking corrective action, and the loss of the contracts by the protestors in CBY and SA-TECH was determinative in finding that protestors had standing to bring their respective cases. In this court, however, corrective action has not been taken by the Navy and MLS has not lost its Contract, or the ability to bid on future task orders. The crucial

distinction between the above captioned protest and <u>Systems Application & Technologies</u> and <u>CBY</u> is that in these two reported cases, corrective action was taken by the agencies. The Federal Circuit in <u>Systems Application & Technologies</u> found, in noting that the Army intended to terminate SA-TECH's contract and take corrective action, "[i]n this case, the Army had not yet implemented the corrective action. Moreover, SA–TECH was the contract awardee. Neither of these facts are material to the question of jurisdiction." <u>Sys. Application & Techs., Inc. v. United States</u>, 691 F.3d at 1381. The Federal Circuit concluded: "This court has made clear that bid protest jurisdiction arises when an agency decides to take corrective action even when such action is not fully implemented." <u>Id.</u> In <u>CBY</u>, in response to the GAO decision, the Corps decided to take corrective action, and in so doing, terminated CBY's contract. The <u>CBY</u> court held that: "Absent this corrective action decision, CBY would either be performing the contract today, or defending its award in a bid protest initiated by the intervenors. Thus, the decision to take corrective action had legal consequences, precluding plaintiff from performing the contract or resolving the propriety of its award." <u>CBY Design Builders v. United States</u>, 105 Fed. Cl. at 333. In both instances, the courts found that corrective action was essential to the contractor-protestor having the ability to bring a bid protest, which, as demonstrated above, has not taken place in the protest currently before the court.

In <u>Kellogg Brown & Root</u>, which determined the contractor-protestor did not have standing to file a bid protest claim on allegations that would more properly be filed as a CDA claim, the court however, noted, "[o]f course, when a proposed corrective action effectively restores an awardee to the status of bidder by requiring it to compete again for a contract award, this action may be challenged by the former awardee in a bid protest." <u>Kellogg Brown & Root Servs., Inc. v. United States</u>, 117 Fed. Cl. at 769 n.5. Likewise, the <u>Outdoor Venture Corp.</u> court explained that:

> "This Court has held that where a plaintiff, as the contract awardee, files a protest challenging an agency's decision to resolicit a proposal, the plaintiff's protest is in the nature of a pre-award claim." <u>Ceres Gulf, Inc. v. United States</u>, 94 Fed. Cl. 303, 315 (2010) (internal quotations omitted). In each of the cases cited by plaintiff, this court found that contract awardees had standing to bring pre-award bid protests because the government resolicited or began to resolicit the contract.

<u>Id.</u> at 153 (citations omitted). The <u>Outdoor Venture Corp.</u> court, however, noted that

> [i]n this case, OVC's award has been stayed, but OVC does not allege that the government has resolicited the contract or that it intends to do so. Because there has been no resolicitation-as there was in the cases cited by plaintiff-OVC's protest is not in the nature of a pre-award claim. Therefore, OVC has failed to establish that it is an interested party with standing to bring this bid protest.

<u>Id.</u> (internal references omitted). Even though performance under the contract in <u>Outdoor Venture Corp.</u> was stayed, merely staying the contract was not sufficient for the United States Court of Federal Claims to find standing for the <u>Outdoor Venture Corp.</u> protestor. OVC had a stronger argument to have standing with contract performance being stayed, compared to MLS, which as indicated in the joint stipulations, continues to perform task

orders under the Solicitation and its Contract. Therefore, the court finds that because corrective action has not yet been taken, and MLS continues to perform under the Contract, MLS cannot satisfy the interested party requirement, and lacks standing to bring this pre-award bid protest.

In the case of MLS, in addition to no corrective action having been taken, and performance of the Contract and task orders still ongoing, the court questions whether, even if the court were to find in favor of MLS on the merits, corrective action would necessarily take place. The Navy has indicated its intention to review MLS' concerns "in the context of the overall acquisition strategy and solicitation development for the upcoming worldwide husbanding solicitation," but the Navy also has made it clear that the review of the issues raised by MLS is for future husbanding contracts, and not with regard to the Solicitation that resulted in the current contracts for husbanding services.[13] As noted above, in its complaint, MLS seeks declaratory relief and injunctive relief, and asks this court to require the Navy "to revise the Solicitation so that its Port Tariff provisions are consistent with applicable laws and regulations, and to allow MLS and other offerors to compete on a fair and equal basis for award of a contract under the Solicitation and for task orders thereunder." Although under its bid protest jurisdiction the United States Court of Federal Claims can issue declaratory relief and issue injunctions in appropriate government contract related circumstances, the court does not take over the function of deciding what to include in a solicitation, or how to revise one. As noted by the Federal Circuit in Savantage, determining an agency's minimum needs "'is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess.'" Savantage Fin. Servs. v. United States, 595 F.3d 1282, 1284 (Fed. Cir. 2010) (quoting Wit Assocs., Inc. v. United States, 62 Fed. Cl. 657, 662 (2004)); see also COMINT Sys. Corp. v. United States, 700 F.3d at 1384. But see Klinge Corp. v. United States, 82 Fed. Cl. 127 (2008).[14] In the bid protest currently at issue, the court should not dictate to the

---

[13] At the March 2019 oral argument, defendant's counsel stated that Navy

> [a]ppreciate[s] that the Court has concern about this issue and are thinking hard about it, and, you know, it's well outside of the sort of boundaries of what's going on in this courtroom, but they are talking to maritime experts and admiralty experts, people in different legal offices in the Navy, which is obviously a very big agency, and looking into this, and there's going to be a future procurement that will be the followon to this one at some point, and they are looking at this closely.

Also at the March 2019 oral argument, the government indicated "I feel like we've done the due diligence necessary based on historical information, based on the fact that MLS performed previously under similar terms and conditions as before, and we don't see that there's any change. . . ."

[14] In Klinge Corp. v. United States, the protestor alleged that the Marine Corps Systems Command (Marine Corps) acted arbitrarily, capriciously, and in violation of law, in awarding a contract for the delivery of Large Field Refrigeration Systems to Sea Box, Inc. (Sea Box). See Klinge Corp. v. United States, 82 Fed. Cl. at 137-38. The United States

Court of Federal Claims Judge ultimately ordered that "[t]he Marine Corps is enjoined from accepting further performance of the contract with Sea Box and is directed to terminate the contract to Sea Box." Id. at 139. Although the contract in Klinge was ordered to be cancelled, the facts and circumstances in Klinge were unique. Notably, the Judge decided:

> After preliminary review of the record and the pleadings, the court advised the parties via a telephone conference held on March 18, 2008, that it would remand to the agency so that it could further develop the record and explain its analysis of the TAA compliance issue. Our concern was triggered by what we viewed as clearly contradictory indications in Sea Box's submission with respect to its TAA compliance. We were particularly concerned that the CO dealt with these contraindications by relying on oral representations from Sea Box's in-house counsel, Mr. Farber, as to what the President of Sea Box had told him concerning the manufacturing activities that take place in China. Consequently, in our March 19, 2008 remand order, we directed the agency to "obtain from Sea Box a written explanation of the entire process of manufacturing, assembly, and testing of its refrigerated containers sufficient for the agency to adequately assess compliance." Klinge was also given a chance to supplement its explanation of how its proposal satisfied the TAA certification requirement.

Id. at 132. Following this instruction,

> Sea Box, after consultation with its parts supplier, admitted that 29 percent of the costs of its parts included in CLIN 0003 were not sourced from the United States or from a designated country. Because of this admission and the fact that nearly one year had passed since the solicitation had been issued, the record reflects that the CO intended to cancel the award to Sea Box and the solicitation and do new market research with the idea of issuing a new solicitation at a later time. The agency, however, changed course shortly thereafter and defendant filed a motion to extend the stay of proceedings in order to give the agency more time to solicit further information from both offerors regarding TAA compliance. We granted that motion on April 8, 2008.

Id. at 132-33 (footnotes and internal references omitted). In response, the contracting officer stated her inclination "to allow Sea Box to continue performance of this contract based on its most recent representations," which the Klinge court indicated, "[w]e take this to mean that, left to its own, the agency would not insist on manufacture in the United States." Id. at 133. After all this, the Klinge court permitted protestor to file an amended complaint. As indicated above, the Klinge court ultimately enjoined performance of Sea Box's contract and directed the Marine Corps to terminate the contract to Sea Box. See id. at 139. The Klinge court did so after the initial review of the protest, a remand to the agency and a finding of arbitrary and capriciousness by the agency.

Navy the specifics of determining its future needs or dictate which requirements to include, or omit, from a solicitation, for example, regarding how to handle husbanding services in the Middle East. In the appropriate case, the agency can be advised by the courts that it has acted arbitrarily and capriciously or violated applicable law. Certainly the court would expect the agency to take valid concerns seriously, but the court cannot treat the Solicitation or MLS' Contract as if corrective action has been taken, will occur, or as if the Contract has been cancelled. It remains speculative when or if any of those events will come to pass even if the merits of MLS' allegations is determined correct.

Moreover, if this court were to consider MLS' protest to be similar to those cases in which corrective action was taken and the corrective action had the effect of voiding MLS' contract resulting in the solicitation process having to start anew, placing MLS in a position as a potential offeror again, MLS, as an ongoing contract performer, might have a difficult time to demonstrate prejudice. Defendant also argues that MLS cannot show a "non-trivial competitive injury," because "MLS's claim is undermined by the fact that it was awarded a contract under the Solicitation and has competed for and was awarded more than 20 task orders." Defendant also contends that "[b]ecause all awardees are bound by the contested terms, MLS is on an equal ground with all other awardees when competing for individual task orders. MLS has not explained how modification of the contested Solicitation terms would improve its position as contract awardee or improve its ability to compete for individual task orders." Intervenor argues that "MLS ignore[s] the fact that all offerors were required to bid against the same Solicitation, and all awardees' Contracts have the same terms. MLS therefore cannot demonstrate that it was in any way disadvantaged or otherwise competitively injured." In response MLS argues that "[t]he uncertainty created by the RFP's impossible Port Tariff provisions prejudiced MLS by preventing MLS from offering its best terms in a proposal and from having a fair opportunity to compete for the contract and task orders." Protestor also argues that "[a] solicitation containing provisions requiring or encouraging the contractor to violate local laws and regulations also favors unscrupulous contractors and does not promote full and open competition."

As noted above, in the context of a pre-award bid protest, the United States Court of Appeals for the Federal Circuit has determined that to show the requisite "direct economic interest," and, therefore, to be an "interested party" under the Tucker Act, the protestor has to have suffered a "'non-trivial competitive injury which can be redressed by judicial relief.'" See Orion Tech., Inc. v. United States, 704 F.3d at 1348 (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1362–63); see also COMINT Sys. Corp. v. United States, 700 F.3d at 1383 n.7. As indicated by the Federal Circuit in Systems Application & Technologies, "[a] protest will, by its nature, dictate the necessary factors for a 'direct economic interest.' In pre-award protests, for instance, the plaintiff must show 'a non-trivial competitive injury which can be addressed by judicial relief.'" Sys. Application & Techs., Inc. v. United States, 691 F.3d at 1382 (quoting Weeks Marine, Inc. v. United States, 575 F.3d at 1359).

The court does not agree with defendant and the intervenor that simply because MLS was an awardee of the Contract, and was performing under the Contract, or because all the offerors "were required to bid against the same Solicitation," that there is no

possibility of economic harm. It could be the case that all contractors, and not just MLS, suffered harm because of the uncertainty of a Solicitation provision, and MLS was the only offeror/awardee to raise the issue at the administrative level to the Navy, to the GAO, and to bring it to the court's attention.

More convincingly, in its reply brief defendant argues that

> even if it did not offer its best price terms in its proposal, it suffered no prejudice. MLS's claim that it was injured by being unable to offer its best price terms is undermined by the terms of the Solicitation, which permit awardees to submit task order proposals equal to or less than the prices set forth in their contracts.

The court notes that the price submitted by MLS in response to the Solicitation when competing for a contract was a maximum, not a fixed amount, for the potential, future task orders. The Solicitation indicated that that multiple awards would be made based upon a lowest price, technically acceptable, source selection decision. The Solicitation provided that "[o]fferors shall propose firm-fixed unit prices for the basic contract and those prices shall be used for evaluation for award of the basic contracts, and serve as maximum prices." At the end of the day, each offeror had the ability to propose what it considered the most advantageous price in order to obtain a contract.

Indeed, the Navy intended to award, and has awarded, specific task orders to carry out the husbanding support services in the various ports. The Solicitation contemplated making multiple awards and for contract awardees to "compete at the task order level for task orders to provide husbanding services for particular port visits." The joint stipulations indicate that "[t]he Solicitation requires that, for task order proposals, offerors are to propose fixed prices that include all costs of providing the required husbanding services, including, as relevant here, port tariff services." The joint stipulations states that:

> The Solicitation provides that one or more task orders may be issued during performance of the contract. Pursuant to the terms of the Solicitation, requests for task order proposals (RTOP) for specific port visits are issued and contractors have the opportunity to submit offers. A selection would then be made, in most cases, based upon a lowest price technically acceptable basis.

The Solicitation provided that for the requests for task order proposals, "all proposed prices at the task order level" "shall not exceed the maximum prices indicated in the  basic contract," and that for the task order proposals, offerors were to propose fixed prices that include all costs of providing the required husbanding services, including port services. Therefore, even if MLS did not submit its lowest bid to receive a contract in response to the Solicitation because of its uncertainty with the Port Tariff provisions before the proposals were due, given the clear direction from the Navy that it would not make any changes to the Port Tariff provisions at this time, MLS could now price that certainty in its offer when submitting bids for future task orders.

The court notes that in <u>CBY</u>, quoted above, the <u>CBY</u> court ultimately found there was economic harm, and found standing. The <u>CBY</u> court determined that:

> The government also moves to dismiss the case on the ground that CBY has "yet to suffer any injury or loss of direct economic interest," and thus lacks standing to pursue the matter. The corrective action announced by the agency, "to follow the course of action recommended by GAO," includes amending the solicitation, requesting and evaluating new proposal revisions, and necessarily making a new award. The GAO did not recommend terminating CBY's contract unless "an offeror other than CBY is selected for award" after the second competition is completed. But CBY has gone from being the awardee, ready to begin performance on the contract (or to help defend against a bid protest in our court) to just one of the offerors, who must compete again. Unlike the more typical pre-award bid protest, where the challenge occurs before proposals are received and evaluated, *see Weeks Marine*, 575 F.3d at 1361, here we know that but for the decision being challenged, CBY would be the awardee. If the loss of a substantial chance of being an awardee is a sufficient economic interest to support standing, then the loss of the certain chance of being the awardee (even if a substantial chance of winning the new competition remains) should also be sufficient for purposes of standing. *See Centech Grp.*, 78 Fed. Cl. at 504. The Federal Circuit has found that an offeror who had a substantial chance at receiving a large portion of contracts through sealed bidding but an uncertain chance at receiving them as task orders possessed the requisite economic interest to support standing. Weeks Marine, 575 F.3d at 1362. The Court finds the impact of the corrective action on CBY to be similar. If, as CBY alleges, it is arbitrarily being required to win the same award twice, this is certainly the sort of non-trivial competitive injury sufficient to support its standing to object to the corrective action. *See Centech Grp.*, 78 Fed. Cl. at 504; *Sheridan Corp.*, 95 Fed. Cl. at 149; *Jacobs Tech.*, 100 Fed. Cl. at 178; *Sys. Appl. & Techs.*, 100 Fed. Cl. at 708. By effectively changing this competition from a single- to a double-elimination tournament for all offerors in Phase II but CBY, the Corps has inflicted sufficient competitive injury upon plaintiff to support the protester's standing to challenge this change.

<u>CBY Design Builders v. United States</u>, 105 Fed. Cl. at 336–37 (internal references omitted; footnote omitted). Although the <u>CBY</u> court found the possibility of <u>CBY</u> protestor having to arbitrarily win the same award twice sufficient harm, MLS is not arguing that it would arbitrarily have to win an award twice – rather it is seeking to redo the entire contract competition. It does not allege that the possibility of going through the solicitation process again would be arbitrary, rather MLS urges cancellation is required. Likewise, the <u>CBY</u> court found harm because going through the entire solicitation process again "effectively changing this competition from a single- to a double-elimination tournament for all offerors in Phase II but CBY." In the above captioned protest, however, eight other

offerors were awarded contracts under the Solicitation, and, therefore MLS would not be only offeror impacted by corrective action. Unlike the protestor in CBY, MLS neither would be able to demonstrate a non-trivial competitive injury nor prejudice, and, therefore, could not meet the interested party standard. See Digitalis Educ. Sols., Inc. v. United States, 664 F.3d at 1384 (citing MCI Telecomms. Corp. v. United States, 878 F.2d at 365). In sum, MLS is not an interested party, and, therefore, does not have standing to bring a protest in this court.

Although the court has found that MLS is not an interested party, and, therefore, the court does not have jurisdiction to decide the merits of MLS' protest in Case No. 18-998C, the court remains troubled by the factual allegations raised by protestor and the factual information assembled over the course of the proceedings before this court. It is evident from the record developed in this protest that MLS raised a serious issue regarding the Port Tariff provisions and whether a contractor can enter the ports without being an agent of the Navy. It appears to the court that winking and nodding may be going on during contact performance in order for the existing contractors to perform the required services. As noted in the questions MLS asked the Navy before the contracts were awarded," [h]ost nation regulations stipulate that all ships berthed in ports of CENTCOM should have a licensed agent. How will the contractor meet the requirement of declaration as agent to the port if the contract does not permit it?" During the questions and answers portion of the Solicitation or after MLS' agency level protest, the Navy did not amend the Solicitation terms, and offered not helpful responses to MLS' questions. Moreover, the Navy did not respond to MLS' subsequently filed agency level protest before bid proposals were due. During the proceedings in this court, the Navy and the Department of Justice remained skeptical of MLS' claims that the agency position would present any problems for the contractors even after counsel for MLS identified two instances, first at the port of Jebel Ali and, second, the port of Fujiarah in the United Arab Emirates, at which, MLS advised the ports it was not the agent of the Navy and the ports rejected MLS' request to enter the ports. As noted above, counsel of record for MLS indicated at oral argument:

> [M]y client determined to be completely straightforward and honest with the port and advised them that we were not an agent for the Navy, and when we advised them we were not an agent, they said two things. They said you may not work in this port as long as you're not the agent for the Navy, for the vessel; and the vessel may not come into the port until it has a registered agent. And so we followed the requirements of the contract and notified the Navy of that, and the Navy went out and got another contractor who was willing to say they were an agent of the Navy to perform the service, and we were -- notified the Navy of that fact. They threatened to terminate us unless we'd stop saying that.

Also in this court, without specifically commenting on the merits of the Port Tariff provisions, defendant and intervenor have argued that these issues are appropriately considered as issues of contract performance and potentially only subject to CDA claims. MLS specifically commented, however, that it had chosen, at this time, not to proceed with the allegations as contract administration issues. As MLS did not bring a CDA claim

to the contracting officer, nor file its complaint in the United States Court of Federal Claims as one for a CDA claim, this court does not consider a possible CDA claim at this time. The court, however, does note the unfortunate position MLS finds itself in, especially as it appears MLS brought the issues to the Navy's attention in good faith during the Solicitation process and before contract award, with the hope of avoiding precisely the situation MLS found itself in at the ports of Jebel Ali and Fujiarah.[15]

## CONCLUSION

For the reasons described upon, defendant and intervenor's motions to dismiss for lack of subject matter jurisdiction the above captioned protest are **GRANTED**. Protestor's complaint is **DISMISSED**.


**IT IS SO ORDERED.**

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**

---

[15] MLS has the option to pursue a CDA claim as a contractor. If MLS decides to file a CDA claim in the United States Court of Federal Claims, in the interest of judicial economy, such a CDA case should be assigned to the undersigned. The undersigned already has carefully reviewed the Solicitation, the Contract and the rest of the lengthy record developed regarding the relevant port regulations, including the necessary, language translations of multiple documents in the record.